62 F.3d 863
 68 Fair Empl.Prac.Cas. (BNA) 785,
66 Empl. Prac. Dec. P 43,696
Tracy DUNNING, Plaintiff-Appellee,
v.
SIMMONS AIRLINES, INCORPORATED, a defunct corporation, now
doing business as American Eagle Airlines,
Incorporated, a wholly owned subsidiary
of AMR Corporation, Defendant-Appellant.
 No. 94-2689.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 7, 1995.
Decided July 31, 1995.
 
 Ernest T. Rossiello, Margaret A. Zuleger (argued), Rossiello & Associates, Chicago, IL, for plaintiff-appellee.
 Hubert O. Thompson, Deborah A. Richard (argued), Carney & Brothers, Chicago, IL, for defendant-appellant.
 Before BAUER, COFFEY and KANNE, Circuit Judges.
 COFFEY, Circuit Judge.
 
 
 1
 Simmons Airlines, Inc., which now operates as American Eagle Airlines, a subsidiary of AMR Corporation, employed Tracy Dunning as a fleet service clerk since 1979. In October of 1991, Dunning was placed on unpaid, involuntary maternity leave for eighteen weeks. She filed a charge against Simmons Airlines with the Illinois Department of Human Rights, and a lawsuit in the United States District Court for the Northern District of Illinois alleging that she was sexually harassed by two of her supervisors at Simmons Airlines and that she was placed on unpaid, involuntary maternity leave in retaliation for complaining to one of her managers about the harassment.
 
 
 2
 The district judge ruled in favor of Dunning on her retaliation claim and entered judgment in her favor in the amount of $6,080 in back pay for the eighteen weeks she was placed on leave. The defendant filed a motion to set aside the judgment which was denied, and the court awarded back pay and $45,434.75 in attorneys' fees and costs. Simmons Airlines appeals. We AFFIRM.
 
 I. FACTUAL BACKGROUND
 
 3
 In 1989, Tracy Dunning was hired by Simmons Airlines to be a fleet service clerk at O'Hare International Airport in Chicago, Illinois. Her duties included loading and unloading baggage from planes and carts, driving baggage carts, and doing computer work in the bagroom. While at Simmons, Dunning reported to five different ramp supervisors, Fred Mills, Louis Domenech, Gregory Dortch, Hal Jerklin, and Cedric Turner. The ramp supervisors all reported directly to the ramp department manager who in 1991, when the majority of the events which comprise this lawsuit took place, was Mark Yankowski.
 
 
 4
 At trial, Dunning, a married woman, testified about four incidents in which she was sexually harassed by co-workers or supervisors at Simmons Airlines. In November, 1989, she alleged that one of her co-workers, Herb Bell, grabbed her right breast. Dunning complained to her supervisor, Fred Mills, who told her to write up a report about the incident. Dunning did so, but did not keep a copy of the report, nor did Mills give her a copy of it. Mills spoke to Von Williams, the ramp manager, about the incident. Several days after Dunning reported Bell's actions to Mills, Williams told her that the company could take no action concerning her complaint because there were no witnesses to the incident, although at the time of trial, Dunning testified that two co-workers were present when Bell allegedly assaulted her.[1] There is no indication in the record that Dunning or anyone at Simmons Airlines pursued further action regarding this matter.
 
 
 5
 The next incident occurred in May, 1990, when Dunning heard that Gregory Dortch, one of her supervisors, was telling one of her co-workers, Kevin Bonnett, "that he wanted to sleep with [her.]" Dunning stated that as soon as she heard that Dortch was making such statements, she reported the remarks to Mark Yankowski, her ramp manager, although she did not advise Yankowski who was making the remarks. When asked about Yankowski's reaction to her complaint during direct examination, the plaintiff testified that Yankowski simply responded "okay," and did not press her to identify the individual who was making the suggestive statements about her. As to this second incident of harassment, Yankowski testified and denied that Dunning ever lodged a complaint that Greg Dortch was telling co-workers that he wanted to engage in sexual intercourse with her.
 
 
 6
 In April, 1991, Louis Domenech, another of Dunning's supervisors, allegedly exposed his genitals to her when no one else was present and told her that she "should try some Puerto Rican meat." The next day, Dunning complained to Yankowski about Domenech's actions. When queried on direct examination as to the reason why she waited a day to lodge her complaint, Dunning responded that she did not report Domenech's actions right away "because in other instances when I complained nothing was done, and I was scared, I didn't know what to do. I didn't know if I should tell someone, or what." The plaintiff again withheld the name of the perpetrator of the harassment (Domenech), although on this occasion Yankowski asked her who it was. Dunning testified that she refused to tell Yankowski who harassed her because she "was not there to get anyone in trouble; [she] just wanted him to know what was going on." Dunning did not know if any investigation was made into these allegations.
 
 
 7
 Once again, Yankowski denied that Dunning had lodged any complaint about Domenech exposing himself to her. However, Rosie Shadd, a fleet service clerk and one of Dunning's co-workers, testified via deposition that in the summer of 1992, she was in the freight office one day with Louis Domenech and Greg Dortch and heard Domenech complain that Dunning wrote up a report accusing him of exposing himself to her, and Shadd further testified that Domenech showed her the report in question. Shadd also stated that Domenech was "very angry" about Dunning filing the report.
 
 
 8
 The final incident occurred in July, 1991. At that time, Dunning was told by a female co-worker that Louis Domenech told Mike Brown, a male employee, that Dunning engaged in oral sex with Gregory Dortch in his office. Dunning spoke with Brown later that day and he admitted that Domenech made these statements to him, but he refused to join Dunning in reporting the incident to Yankowski stating that his supervisors were "already on his back" about his poor attendance record. Dunning reported Domenech's statements to Dwight Harris, Chuck Arnieri, and Joyce Ely, the president, vice-president, and treasurer of the local union. Harris and Arnieri accompanied the plaintiff to ramp manager Yankowski's office to lodge a complaint against Domenech.[2]
 
 
 9
 Dunning testified that she was crying and very upset during this meeting and that Yankowski told her, in front of Arnieri and Harris, "to either give him the facts or get out of his office." After she finished relating the problems, Yankowski inquired of her if she had any witnesses. Dunning stated that she did not have any witnesses.[3] Yankowski told Dunning to come back to his office the following day and that he would inform her what action, if any, he would take concerning her complaint. After this meeting, Harris suggested to Dunning that she write her account of the incidents concerning the sexual harassment, and she complied and gave the report to Harris.
 
 
 10
 When Dunning returned to Yankowski's office for the pre-arranged meeting the following day, Arnieri accompanied her. Louis Domenech and Gregory Dortch were present during the meeting and each of them individually denied the allegations Dunning made against them. Yankowski, although present, withdrew from the matter and let Domenech and Dortch, the accused, handle the resolution of Dunning's complaints. Domenech and Dortch informed Dunning that they were placing a disciplinary report (CR-1) in her personnel file for her "misrepresentation of facts," concerning her claim that she was sexually harassed. Yankowski testified at trial that he had not investigated Dunning's allegations other than to question Domenech and Dortch about whether they were spreading such rumors about Dunning. Dunning did not complain further to Yankowski about the disciplinary action "because he had left it up to the persons that [she] accused to discipline [her]."
 
 
 11
 At trial, Domenech, Dortch and Yankowski presented versions of the facts that contradicted those testified to by Dunning. Yankowski testified that Domenech and Dortch, not Dunning, brought to his attention the alleged rumors being spread about Dunning. Yankowski further testified, under oath, that when he was informed about the rumors, he told Domenech and Dortch to speak to Dunning about the allegations and also instructed the two men to call Employee Relations for advice on how to handle the matter.
 
 
 12
 Louis Domenech denied spreading rumors about Dortch and Dunning, and he also denied exposing his genitals to Dunning. Domenech further testified about the following facts concerning the rumors he was allegedly spreading. He stated that when he heard about the rumors, he spoke with Joyce Ely, a fleet service clerk who was the treasurer of the union, and that she investigated the rumors and informed Domenech that there were witnesses to verify that he was, in fact, spreading lewd stories about Dunning. Domenech further testified that he called Ely and Dunning into his office to discuss the rumors and Dunning refused to tell him who told her about them.
 
 
 13
 Domenech continued by stating that Ely left the meeting for a while, and came back after Dunning was gone to tell Domenech that the allegations of sexual harassment were just a misunderstanding and that Dunning was dropping all her complaints. Domenech informed the court that after Ely left his office, he and Dortch went to Yankowski to ask him what actions they could take against Dunning for filing a false complaint. Both men stated that after discussing the matter with Yankowski, they all came to the decision that Dunning should be given a disciplinary report for her "misrepresentation of facts," although Yankowski testified that he asked Domenech and Dortch to speak with someone in Employee Relations to find out what to do about disciplining Dunning.
 
 
 14
 Gregory Dortch denied ever having told anyone that he wanted to sleep with Dunning, and testified that he originally learned about the rumors from Ely, who came to his office to inform him that Dunning had lodged a complaint against him for sexual harassment. He also told the court that Ely eventually told him that Dunning was dropping her complaints and that the charges were fabricated.
 
 
 15
 However, when Ely testified at trial, she denied ever having informed either Louis Domenech or Gregory Dortch that Dunning lodged complaints about them. She also denied telling these two men that Dunning had fabricated her allegations of sexual harassment. In fact, she testified that she never even spoke with Domenech or Dortch about the allegations that they were spreading rumors about Dunning and Dortch engaging in oral sex with each other.
 
 
 16
 In August, Dunning learned that she was pregnant. Shortly thereafter, she informed Simmons Airlines of her pregnancy because she was under doctor's orders to refrain from engaging in any heavy lifting of items that weighed more than ten pounds for at least three months. As a result, she was assigned such tasks as doing computer work and doing quality checks, looking at the tags on the luggage in the bagroom to make sure that each piece of baggage was sent to the proper destination. In the middle of September, her shift changed and she was assigned to drive the international van, which transported baggage from international flights to connecting American Eagle flights.
 
 
 17
 The events on October 21, 1991, which form the basis for Dunning's retaliation complaint, all took place some three and one-half months after Dunning complained to Yankowski about the rumors Louis Domenech and Gregory Dortch were allegedly spreading about her. Dunning was assigned to drive the international van, but it needed repairs and the replacement vehicle provided for the day had no shock absorbers. Because Dunning was experiencing morning sickness that day, she was concerned that driving a vehicle without shock absorbers would aggravate her condition. She asked Hal Jerklin, another one of her supervisors, if she could work in the bagroom that day and perform computer work, and he granted her permission to do just that.
 
 
 18
 Within minutes of arriving in the bagroom, however, Domenech called Madelene Jones, one of the plaintiff's co-workers in the bagroom, and told her to inform Dunning that she was to report to the L-7 belt,[4] and to come to his office immediately if she had any problem with that assignment.[5] Jones told Dunning that Domenech said he did not want her working with Joyce Miller, another fleet service clerk, yet when Domenech testified, he explained that the volume on the L-7 belt was high that day and he needed Dunning to work the position.
 
 
 19
 Dunning and Miller went to Domenech's office and he instructed Dunning to work on the L-7 belt. The L-7 belt is located between concourses at O'Hare, and it is enclosed with eight to ten garage-like doors. Tugs and small cars which transport luggage between the belt and the aircraft are routinely in and out of the structure. Dunning responded that she was experiencing morning sickness and preferred to stay in the bagroom, rather than at the L-7 belt where she would be exposed to noxious carbon monoxide fumes from the tugs and small cars that drive through the L-7 area, because those fumes made her sick. Miller then offered to work the job at the L-7 belt instead of Dunning so that the plaintiff could continue working on the computer and would not become sick from the gas fumes in the L-7 belt area. Domenech refused Miller's offer to substitute for Dunning on the L-7 belt assignment, telling her that the assignments were none of her concern, and instructed her to leave his office.
 
 
 20
 After Miller left the office, Dwight Harris, union president, was asked to join the meeting between Dunning and Domenech. In Harris's presence, Domenech again asked Dunning to work on the L-7 belt and she responded that because the fumes associated with the position would aggravate her morning sickness, she would prefer to work in the bagroom. Dunning and Harris testified that Domenech offered her no alternative position, but Domenech denied this and stated that he offered her the option of driving at the "T" point,[6] but that she also refused this assignment. After Dunning refused the L-7 position, Domenech left the office and during his absence, Harris wrote some notes summarizing the exchange that took place between Dunning and Domenech.
 
 
 21
 About thirty minutes later, Domenech returned to the office after having spoken with Yankowski and an Employee Relations representative. He told Dunning that he was placing her on involuntary, unpaid maternity leave because she refused to perform the light-duty job available, the L-7 position. He asked her to sign the maternity leave papers he had with him. She refused to do so and at that time he again departed the office. When he returned fifteen to twenty minutes later, he was accompanied by Yankowski. Domenech then signed the forms and Yankowski and Domenech affixed their signatures to the bottom of the form, below the statement "employee refuse[d] to sign." On October 28, 1991, Dunning filed a Statement of Grievance with Simmons, protesting her placement on involuntary, unpaid maternity leave. Her grievance was denied.
 
 
 22
 During the first week of November, 1991, after she had been placed on involuntary leave, the plaintiff, along with Marty Liffridge, a fleet service clerk who served as a Transport Workers Union representative, went to Mark Yankowski's office to obtain copies of the reports Dunning wrote about the incidents of harassment. Prior to this time, Dunning had spoken to an attorney, and was in the process of pursuing a Title VII action. She testified that she wanted copies of the reports to give to her counsel to assist in the preparation of her case. Dunning informed the court that she had seen the reports of the Herb Bell, Louis Domenech, and Greg Dortch incidents. After the plaintiff had seen each of these three reports, she asked Yankowski to provide her with copies of the three harassment reports for litigation purposes and he told her to come back the following week for the duplicates. Marty Liffridge corroborated Dunning's testimony, stating that he too had seen these reports the first time Dunning retrieved her file. When Dunning and Liffridge returned to Yankowski's office the following week, Domenech and Yankowski were present, but the reports were no longer in the plaintiff's personnel file. Liffridge asked Louis Domenech where the reports were and Domenech responded that he did not know.
 
 
 23
 On April 17, 1992, she filed this lawsuit, charging that she was retaliated against because she lodged complaints with Yankowski concerning the sexual harassment to which she was subjected in violation of Title VII of the Civil Rights Act. On July 17, 1992, Dunning filed a charge against Simmons Airlines with the Illinois Department of Human Rights again alleging retaliation for having complained about the harassment. After a bench trial, the judge found in Dunning's favor on her claim that she was placed on unpaid, involuntary maternity leave in retaliation for her complaints of sexual harassment, and awarded her back pay in the amount of $6080 to compensate her for the eighteen weeks of unemployment while she was on a forced maternity leave. The plaintiff's attorneys also submitted a request for attorneys' fees in the amount of $45,434.75, which the court granted. Simmons appeals.
 
 II. ISSUES
 
 24
 On appeal, Simmons Airlines argues that: 1) the district court clearly erred when it determined that Domenech retaliated against Dunning for complaining about incidents of sexual harassment in exercise of her Title VII rights; and 2) the district court abused its discretion by awarding Dunning attorney's fees for all her claims when she only prevailed on one of the claims.
 
 III. DISCUSSION
 A. Retaliation
 1. Standard of Review
 
 25
 When reviewing a record, "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Fed.R.Civ.P. 52(a); see also Brenner v. Brown, 36 F.3d 18, 19 (7th Cir.1994) (we "will not overturn the district court's findings concerning discrimination and claims of retaliation unless those findings are clearly erroneous"). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." United States v. Tilmon, 19 F.3d 1221, 1224 (7th Cir.1994) (citation omitted). "Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985). We refuse to second-guess the court's credibility determinations because the
 
 
 26
 judge has had the opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements, rather than looking at the cold pages [of a transcript].
 
 
 27
 United States v. Robinson, 30 F.3d 774, 786 (7th Cir.1994) (quotation omitted, alteration in original).
 
 2. Discussion
 
 28
 It is unlawful "for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. Sec. 2000e-3(a); see also Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 321 (7th Cir.1992). Unlawful practices do not consist only of " 'economic' or 'tangible' discrimination," but rather include "the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatory hostile or abusive environment" such as one in which an employee is subjected to sexual harassment. Harris v. Forklift Systems, Inc., --- U.S. ----, ----, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993).[7] To make out a prima facie case of retaliation a plaintiff must establish that: "1) she engaged in statutorily-protected expression; 2) she suffered an adverse action by her employer; and, 3) there is a causal link between the protected expression and the adverse action." Dey, 28 F.3d at 1457 (citation omitted). "If she makes that showing, the burden of producing a legitimate, nondiscriminatory reason for her discharge shifts" to the defendant. Id. (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). If the defendant produces a legitimate, nondiscriminatory reason, the plaintiff then "bears the burden of showing that [the defendant's] proffered reasons are pretextual and that its actual reason was discriminatory." Id. The plaintiff bears the ultimate burden of persuading the trier of fact, St. Mary's Honor Center v. Hicks, --- U.S. ----, ----, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993), that "the employer's articulated rationale is pretextual, either by showing that a discriminatory reason more likely motivated the employer or that the employer's proffered reason is unworthy of credence." Perfetti v. First National Bank of Chicago, 950 F.2d 449, 450-51 (7th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 2995, 120 L.Ed.2d 871 (citation omitted). "[R]ejection of the defendant's proffered reasons, will permit the trier of fact to infer the ultimate fact of intentional discrimination, and ... no additional proof of discrimination is required." Hicks, --- U.S. at ----, 113 S.Ct. at 2749 (quotation omitted, emphasis in original).
 
 
 29
 Simmons Airlines argues that the district court incorrectly found that Dunning was retaliated against because she exercised her Title VII right to complain about sexual harassment. It contends that Dunning failed to prove that there was a causal link between her complaints and her placement on unpaid, involuntary maternity leave. Simmons Airlines also contends that Dunning failed to establish that Domenech's reasons for placing her on leave were pretextual because there was no proof that other similarly situated employees (i.e., pregnant women with medical restrictions) were treated more favorably than she was. Finally, Simmons Airlines argues that the district court's mere disbelief of Domenech's testimony does not constitute pretext.
 
 
 30
 Although the parties dispute how many claims of harassment Dunning brought to the attention of her supervisors at Simmons Airlines[8] and how Yankowski eventually became aware of the rumors Domenech was allegedly spreading about her and Dortch,[9] Simmons does not challenge the fact that Dunning engaged in an activity protected by Title VII, and thus the first element of the prima facie case of retaliation was established. Simmons Airlines admits the fact that Dunning complained of sexual harassment in July of 1991 and although it contests whether she actually was harassed, it does not contest the fact that she made a protected complaint.[10] The parties also do not dispute that Dunning suffered an adverse action by her employer when she was placed on involuntary, unpaid maternity leave. Thus, the only issues for us to resolve are whether there was a causal link between Dunning's complaints and her placement on maternity leave and whether Domenech's reasons for placing her on leave were pretextual.
 
 
 31
 Louis Domenech asserted that he placed Dunning on unpaid, involuntary maternity leave because she refused to work on the L-7 belt, a job which did not impinge on any of her physician-imposed medical restrictions. He further testified that he needed Dunning to work on the L-7 belt the day that he ordered that she be placed on involuntary maternity leave because the baggage flow was particularly heavy. Because she would not work on the L-7 belt, and because there were no other light-duty jobs available, according to Domenech, he testified that he had no choice but to place Dunning on leave. The district judge found Domenech's testimony incredible, and based his finding that Domenech's reasons for placing Dunning on leave were pretextual on numerous factors. The court first noted that when Yankowski received Dunning's complaint about the rumors being spread about her and Dortch:
 
 
 32
 Yankowski said he would look into it. This testimony is supported and corroborated by Ms. Ely.... We believe this is essentially what happened, and we reject the testimony of Mr. Domenich [sic], Mr. Dortch, and Mr. Yankowski to the extent it is at variance with this version of the facts.
 
 
 33
 What happened after that is puzzling. Mr. Domenich [sic] and Mr. Dortch somehow became the decision-makers on the validity of Ms. Dunning's complaint about them. They later advised Yankowski that the complaint was baseless and made up. They testified that union official Ely told them, and Miss Ely flatly contradicted their testimony, and we accept her version of the facts. Domenich [sic] and Dortch [the accused] then wrote up the plaintiff for false information in her personnel record.
 
 
 34
 We conclude that Mr. Domenich [sic] simply buried the complaint against him. We make no finding whether there were rumors or whether Mr. Domenich [sic] started them. But we do find he was angry with such charges being made against him and he took steps to make sure they were found to be baseless.
 
 
 35
 Mr. Yankowski apparently paid no further attention to the matter.
 
 
 36
 Thus, the net result of the complaint, which may or may not have had a basis--and, as I say, I don't know whether it did or not--was that Dortch and Domenich [sic] told their supervisor that there was nothing to it and told the supervisor that the union people agreed to that, which was not true, and the plaintiff wound up getting written up for misrepresenting facts as a result of her complaint, a very unpleasant situation.
 
 
 37
 The judge went on to note that although Dunning's doctor told her not to lift more than ten pounds at a time:
 
 
 38
 She was allowed to continue working and placed in positions where no lifting over 10 pounds was required. Those were the restrictions by the two doctors.
 
 
 39
 This is a significant restriction, of course, because Miss Dunning was essentially a baggage handler and her pregnancy removed her from most of the jobs she would normally do. However, it is clear that American [Eagle] had a policy and practice of assigning pregnant workers to lighter duty. The evidence showed several jobs given to pregnant women during the 7 or 8 months they worked before delivery.
 
 
 40
 These included driving a truck in the international division or section, walking passengers to planes, computer work called BO, T-point, an AA belt out in an alley and L-7, which was checking bags at a transfer location.
 
 
 41
 The plaintiff introduced substantial evidence that Simmons Airlines had in the past assigned pregnant women light-duty jobs on a regular basis. Madelene Jones, a fleet service clerk, testified at trial that when she became pregnant, she worked through eight and one-half months of her pregnancy, and when she reached her sixth month, she was assigned to the bagroom where she only performed computer work. She also stated that fleet service clerks performed various tasks other than lifting or working on the L-7 belt such as walking international passengers to and from gates[11] and doing computer work. Joyce Miller testified that she knew of pregnant women who were assigned to do computer work, "set up the boards," do paperwork, and act as "gate-walkers."
 
 
 42
 Rosie Shadd, another fleet service clerk, testified, via deposition, that when she was pregnant and had medical restrictions, Simmons Airlines assigned her to non-lifting tasks such as walking passengers to and from gates, cleaning the area around the gates to the planes, and working in the bagroom. At trial, Theresa Richards McGordy testified that she worked until the ninth month of her pregnancy, during which time she too was a "gate walker," and she sat by the American Airlines belt to ensure that bags that needed to be immediately transferred to American Eagle flights were not placed on the L-7 belt.
 
 
 43
 The only evidence that Simmons Airlines presented to rebut the fact that Dunning could have been assigned to other jobs was that Domenech did not have the authority to assign her to be a "gate-walker." Domenech testified that the reason he placed Dunning on maternity leave was because there were no other jobs for her to perform at that time, yet it is uncontradicted that on the day she was placed on unpaid, involuntary medical leave, there was a need for someone to work on the computer. The district judge noted that:
 
 
 44
 Before she actually began [the computer] work, she was called to a meeting with Mr. Domenich [sic]. He said he had made up the schedule for work and he needed her to work in the L-7 area of the transfer area.
 
 
 45
 Miss Dunning said she couldn't do that because she was concerned about the noxious fumes in that area, and it's true that some evidence was evinced that those trucks carrying the bags do pull into that area and do have some fumes....
 
 
 46
 Mr. Domenich [sic] then consulted with his supervisor, Mr. Yankowski, and personnel people, and then placed Miss Dunning on an involuntary maternity leave for the rest of her pregnancy. And here is the nub of the case. Why was this done?
 
 
 47
 When the court questioned Domenech about why he called Dunning away from the bagroom, he told the court that he did so because he was worried that Dunning would have to do some lifting if she remained in the bagroom, in spite of the fact that she was doing solely computer work. Domenech's statement not only contradicts Madelene Jones, who testified that Domenech told her that he did not want Dunning and Joyce Miller working together, but as the district judge concluded:
 
 
 48
 The court finds that Mr. Domenich's [sic] explanation really makes no sense. He says he only brought her up--and this was in response to questions by the Court--he only brought her up to change assignments because he was worried that the area where she was working would be busy and she would have to do a lot of lifting over ten pounds.
 
 
 49
 That makes no sense to me because she had been assigned to a non-lifting job and many people on light duty had the same job. No one would have required her to lift down in that room no matter how busy the area got.
 
 
 50
 So for that reason alone I find Mr. Domenich's [sic] testimony incredible. But more than that, Mr. Domenich's [sic] actions in placing Miss Dunning on permanently involuntary leave makes no sense. He was confronted with someone who was not driving because of a temporary problem with the vehicle. She had performed that task and other light duties for nearly seven weeks after learning of her pregnancy.
 
 
 51
 The district judge reached the reasonable conclusion that Domenech's actions were a "remarkable thing to do when there were several other jobs she could do, including the one that she had already gotten permission to do in the bag room," and in light of the facts that a co-worker had volunteered to work the L-7 position in Dunning's place, and that once the international van was repaired, Dunning could return to her usual work tasks. This was a credibility determination on the part of the judge, who was also the fact-finder in this trial, and he
 
 
 52
 had the opportunity to observe the verbal and non-verbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements, rather than looking at the cold pages [of a transcript].
 
 
 53
 Robinson, 30 F.3d at 786. Thus, because the trial judge is in the best position to make a credibility judgment, his determination that Domenech was not a credible witness, and his conclusion that placing Dunning on involuntary, unpaid maternity leave could only have been to retaliate against her complaints of sexual harassment are not ones that we will second-guess on review. The court also noted that:
 
 
 54
 We also reject the idea that Mr. Domenich [sic] didn't make the decision [to place Dunning on involuntary leave]. It's true he consulted other people, his supervisor and personnel, but none of these people were present, they relied on what Mr. Domenich [sic] told them, and clearly what he said to them was, "Well, she wasn't willing to do any work," which is simply not true.
 
 
 55
 In our opinion, these conclusions were permissible and reasonable in light of the evidence received at trial. Therefore, the court did not commit error when it determined that there was a causal link between Dunning's complaints and her placement on unpaid, involuntary maternity leave status, and that Domenech's explanation for the adverse employment action was pretextual.
 
 B. Attorney's Fees
 1. Standard of Review
 
 56
 Because the award of attorneys' fees "generally is fact-based, we review it under the 'highly deferential abuse of discretion standard.' " McNabola v. Chicago Transit Authority, 10 F.3d 501, 518 (7th Cir.1993) (quotation omitted); see also Alexander, 40 F.3d at 194 ("this court repeatedly has emphasized that in civil rights and discrimination litigation, district court judges have wide discretion in fashioning reasonable attorney's fees"). "This [discretion] is appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." Hensley v. Eckerhart, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983). "Not only is the trial court in a much better position than the appellate court to make this determination, but neither the stakes nor the interest in uniform determination are so great as to justify microscopic appellate scrutiny." Ustrak v. Fairman, 851 F.2d 983, 987 (7th Cir.1988).
 
 2. Discussion
 
 57
 "In any action or proceeding under [Title VII] the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee ... as part of the costs[.]" 42 U.S.C. Sec. 2000e-5(k). A prevailing plaintiff "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." S.Rep. No. 94-1011, p. 4 (1976), reprinted in 1976 U.S.C.C.A.N. 5912. "[P]laintiffs may be considered prevailing parties for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." Hensley, 461 U.S. at 433, 103 S.Ct. at 1939; see also Alexander, 40 F.3d at 194 ("In order to be considered a 'prevailing party' in a civil rights action, a plaintiff must obtain at least some relief on the merits"); Bigby v. City of Chicago, 927 F.2d 1426, 1429 (7th Cir.1991).
 
 
 58
 The initial fee award is assessed by "multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." Blanchard v. Bergeron, 489 U.S. 87, 94, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989) (quotation omitted).[12] This lodestar figure may be adjusted upward or downward depending on "the important factor of the results obtained." Rivera, 477 U.S. at 568, 106 S.Ct. at 2691 (quoting Hensley, 461 U.S. at 434, 103 S.Ct. at 1940). In cases where the plaintiff achieves only partial success, the court must "consider whether or not the plaintiff's unsuccessful claims were related to the claims on which he succeeded, and whether the plaintiff achieved a level of success that makes it appropriate to award ... fees for ... unsuccessful claims." Id.
 
 
 59
 In [some] cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole and it is difficult to divide hours on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discreet claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.
 
 
 60
 Id. at 569, 106 S.Ct. at 2691 (quoting Hensley, 461 U.S. at 435, 103 S.Ct. at 1940). "Where a plaintiff has obtained excellent results, [her] attorney should recover a fully compensatory fee, and that ... fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." Id. (quotation omitted); see also Hensley, 461 U.S. at 435, 103 S.Ct. at 1940 ("Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee"); Soto v. Adams Elevator Equipment Co., 941 F.2d 543, 552 (7th Cir.1991).
 
 
 61
 "The only other consideration is the reasonableness of the fees. In determining the reasonableness of attorney's fees, this court has rejected the notion that the fees must be calculated proportionally to damages." Alexander, 40 F.3d at 194.[13] "As we understand Sec. 1988's provision for allowing a 'reasonable attorney's fee,' it contemplates reasonable compensation, in light of all of the circumstances, for the time and effort expended by the attorney for the prevailing plaintiff, no more and no less." Blanchard, 489 U.S. at 93, 109 S.Ct. at 944.
 
 
 62
 The parties do not dispute that the court correctly determined the "lodestar" figure. Simmons Airlines does argue, however, that Dunning's award of fees was an abuse of discretion because: (1) she only prevailed on her retaliation claim; (2) she did not succeed on her sexual harassment claim; and (3) she dropped her gender-based discrimination claim before trial. The trial court granted the full amount of attorney's fees requested by Dunning's counsel stating that the fees and costs "were extremely well documented and applie[d] the appropriate criteria," and that Dunning's claims arose from the same basic core of facts.
 
 
 63
 Although Simmons Airlines argues that there was a third and separate claim of gender-based discrimination, it forgets that Dunning brought two claims before the trial court, sexual harassment and retaliation; the sexual harassment and gender-discrimination claims were one and the same because the harassment was the discriminatory conduct. Furthermore, Dunning's requested relief for the sexual harassment and the retaliation was identical; back pay for the time she was on involuntary, unpaid maternity leave and attorney's fees. Once the trial judge determined that Dunning should prevail on her retaliation claim, there was no need to reach the sexual harassment issue for the requested relief of backpay was granted. Thus, the court did not find in Simmons Airlines' favor on the sexual harassment claim; it merely did not reach the merits of the issue.[14]
 
 
 64
 Furthermore, as the district judge noted in his order granting attorney's fees, Dunning "properly presented much of [the sexual harassment] evidence to demonstrate the basis for the retaliation." In order to prove her retaliation claim, Dunning was required to present evidence that she exercised her Title VII rights and suffered an adverse employment action as a result. Thus, all the evidence about sexual harassment was relevant for the retaliation claim to establish that she "reasonably believed in good faith that the practice she opposed violated Title VII." Alexander, 40 F.3d at 195. Dunning's two claims had a "common core of facts" and were based on "related legal theories." Rivera, 477 U.S. at 569, 106 S.Ct. at 2691-92. Because of the interrelated nature of the two claims, her attorneys had to prepare for the "litigation as a whole," rather than merely preparing for "a series of discreet claims." Id. Dunning achieved "excellent results," id., in that she received the relief she requested (backpay for eighteen weeks), and the grant of the fee request was not an abuse of discretion.
 
 CONCLUSION
 The judgment of the district court is
 
 65
 AFFIRMED.
 
 
 
 [1]
 The record does not reflect whether Dunning's report noted that there were two witnesses
 
 
 [2]
 Dunning testified that she asked Arnieri and Harris to accompany her to the meeting with Yankowski so that she might have witnesses as to what transpired during the discussion concerning Domenech's and Dortch's behavior
 
 
 [3]
 Although Brown did admit to Dunning that Louis Domenech was spreading rumors about her and Dortch, Dunning did not tell Yankowski about Brown because Brown asked her not to involve him
 
 
 [4]
 The L-7 position entails monitoring the luggage from American Airlines to make sure that bags from American Airlines flights that must be loaded on connecting American Eagle flights in less than an hour's time are not placed on the L-7 belt. This job only entails light lifting and would not have caused problems with Dunning's medical restrictions
 
 
 [5]
 Yankowski testified that a supervisor has the authority to make and change employee assignments based on the needs at that particular time. Harris, the union president, confirmed that supervisors have this authority
 
 
 [6]
 The "T" point is where the bags for connecting flights between American Eagle and American Airlines are routed. Two individuals were usually assigned to this job and one could drive the carts and the other could lift the luggage
 
 
 [7]
 Title VII addresses more than simply economic or tangible discrimination; it instead reaches the entire spectrum of disparate treatment of men and women in employment, which includes conduct having the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.... When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated
 Dey v. Colt Const. & Development Co., 28 F.3d 1446, 1453 (7th Cir.1993) (quotations omitted).
 
 
 [8]
 The plaintiff testified that she lodged four complaints concerning sexual harassment, whereas Simmons only admits that there were two complaints; one regarding the Herb Bell incident, and the other for the rumors concerning Domenech and Dortch
 
 
 [9]
 Yankowski testified that Domenech and Dortch informed him about the rumors whereas Dunning stated that she told Yankowski about them
 
 
 [10]
 Simmons Airlines does not argue that Dunning had to prove that the alleged harassment actually was so severe that it was actionable under Title VII, and it was correct in doing so because "[t]he conduct a plaintiff opposes need not actually violate Title VII. A plaintiff does not have to succeed on her discrimination claim to make out a prima facie case of retaliatory discharge. Rather, the test is whether she reasonably believed in good faith that the practice she opposed violated Title VII." Alexander v. Gerhardt Enterprises, Inc., 40 F.3d 187, 195 (7th Cir.1994) (citations omitted)
 
 
 [11]
 Yankowski testified that this job was assigned through a different department and that Domenech had no authority to assign an employee to this job
 
 
 [12]
 This figure is the "lodestar" and it is the "centerpiece of attorney's fee awards." Id. "A strong presumption that the lodestar figure--the product of reasonable hours times a reasonable rate--represents a reasonable fee is wholly consistent with the rationale behind" the statute providing for attorney's fees. Id. at 95, 109 S.Ct. at 944-45
 
 
 [13]
 Attorney's fees in Title VII litigation are not limited to a proportion of the monetary damages assessed in the case because, as Congress has recognized, a plaintiff in any civil rights suit acts "not for himself alone but also as a 'private attorney general,' vindicating a policy that Congress considered of the highest importance." City of Riverside v. Rivera, 477 U.S. 561, 575, 106 S.Ct. 2686, 2694-95, 91 L.Ed.2d 466 (1986) (quoting H.R.Rep. No. 94-1558, p. 2 (1976)). "Because damages awards do not reflect fully the public benefit advanced by civil rights litigation, Congress did not intend for fees in civil rights cases, unlike most private law cases, to depend on obtaining substantial monetary relief." Rivera, 477 U.S. at 575, 106 S.Ct. at 2695
 A rule of proportionality would make it difficult, if not impossible, for individuals with meritorious civil rights claims but relatively small potential damages to obtain redress from the courts. This is totally inconsistent with Congress' purpose in enacting Sec. 1988. Congress recognized that private-sector fee arrangements were inadequate to ensure sufficiently vigorous enforcement of civil rights. In order to ensure that lawyers would be willing to represent persons with legitimate civil rights grievances, Congress determined that it would be necessary to compensate lawyers for all time reasonably expended on a case.
 Id. at 578, 106 S.Ct. at 2696; see also Ustrak, 851 F.2d at 989 ("A judicial decision that finds a violation of constitutional rights and punishes the perpetrator with an award of punitive damages not only vindicates constitutional principles but is a deterrent to future violations, to the benefit not only of the plaintiff but of others in similar situations").
 
 
 [14]
 In fact, the district made a point of not ruling on the merits of the sexual harassment claim and stated that the complaints "may or may not have had a basis ... I don't know whether it did or not."