In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 01-1048, 01-1184

LISA S. FINE,

*Plaintiff-Appellee,*
*Cross-Appellant,*

*v.*

RYAN INTERNATIONAL AIRLINES,

*Defendant-Appellant,*
*Cross-Appellee.*

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 97 C 2005—**Larry J. McKinney**, *Chief Judge.*

ARGUED JANUARY 11, 2002—DECIDED SEPTEMBER 19, 2002

Before EASTERBROOK, KANNE, and DIANE P. WOOD, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* Lisa Fine, a pilot for Ryan International Airlines (Ryan), was demoted in April 1996 after failing a required proficiency check. Fine believed that her test had been rigged because Ryan's male leadership did not want women flying its planes. In September of that same year, Fine and three female co-workers wrote a letter to management complaining about Ryan's inequitable treatment of its female pilots. This resulted in

a meeting where management said they could do nothing unless the women made formal written complaints. The next month, when Fine became eligible for a promotion back to her old job, she experienced difficulty in scheduling the required training. This time, she submitted a written complaint to Ryan alleging that this too was based on her sex. Days later Ryan fired her. A jury found that Ryan had illegally retaliated against Fine and awarded her over $400,000 in compensatory and punitive damages and backpay. Ryan appeals both liability and damages; Fine has cross-appealed on several points. We find no error in either the liability or damages verdict in Fine's favor and therefore affirm the court's judgment in those respects; on the cross-appeal, we agree that the figure for prejudgment interest was mistaken, and we remand for a recalculation of that award.

# I

Ryan is a freight air carrier that flies Boeing 727s, each of which requires three pilots: a captain, a first officer, and a flight engineer. Fine, the fourth female pilot ever to work at Ryan, was initially hired as a flight engineer in 1991. Pilots at Ryan can be promoted from flight engineer to first officer upon the completion of upgrade training. Ryan offers the necessary training and promotes from within ranks when it needs new officers. Promotions have been frequent, as Ryan has grown tremendously in recent years. In April 1995, Fine successfully upgraded to first officer.

The Federal Aviation Administration (FAA) requires all pilots to complete an annual proficiency check, which is conducted by the airline in a flight simulator. Fine's annual check was scheduled for April 18, 1996. Normally, Ryan provides all its pilots an opportunity for a warm-up session the day before their check, but this process went awry in

Fine's case. She was misinformed by a Ryan employee that her check was to take place on April 19. She therefore arrived at the training facility on the evening of April 17, in time for an April 18 warm-up, but she was informed that she had missed her warm-up and that the test itself would be administered on the 18th. It was, and she failed it.

Ryan permits all pilots who fail a proficiency check to retest, and so a retest for Fine was scheduled for the next week. Fine passed two warm-ups but failed the check because the check airman determined she had landed long. Fine believed that the simulator had been manipulated to cause her to fail and that the company was using training to get rid of or demote females. She complained verbally to Jim Miller, Ryan's Director of Flight Standards, and Ron Ryan, the company president, who found her explanations "fairly credible." She never reduced this complaint to writing. Because Fine failed her proficiency check, she was demoted to flight engineer. She then was granted a 90-day leave of absence.

In late August 1996, the four most senior female pilots at Ryan (Eugenia Smith, Vicki Ramos, Julie Chapleau, and Fine) met in Indianapolis to discuss issues of workplace harassment and problems with training. Ramos informed Fine that she had been placed in unsurvivable situations in the simulator when she was demoted to flight engineer. Later that month, a fifth female pilot, Kathy Schindelar, who had also been demoted, told Fine that Schindelar believed her own proficiency check had been manipulated and that when she complained to Danny Looney, Vice President of Flight Operations, Looney told her that she could not fly and that "no woman can fly an airplane."

On September 6, the four female pilots wrote a letter to Chief Pilot Dan Scott. The letter stated, "The senior female flight crewmembers of Ryan International Airlines re-

quest fair and equitable treatment by management and staff in all employment matters. Biased and prejudicial attitudes have been maintained and exercised in employment matters." This letter prompted Scott, along with Looney and Human Resources Director Mary McGoldrick, to meet with the women on September 18. The meeting primarily focused on sexual harassment, including complaints that male pilots were labeling the women by the size and shape of their rear ends and spreading rumors about their sex lives, and that female pilots were stereotyped as emotional, criers, and weak pilots. Looney confirmed that male pilots had told him that they would never let Chapleau touch the controls on an instrument approach, that Fine was a whiner, and that no one had anything good to say about Smith. Fine also complained about her failed proficiency check and other training inequities. At the end of the meeting, according to notes taken by Scott, Looney said that he could do nothing unless the women were willing to put their complaints in writing to human resources. He also warned that if they did so "they could expect that the pilots that were carrying any of [them] . . . might not carry them and write them up." The women did not follow up with a written complaint.

At their earlier meeting, the four female pilots had also discussed the rumor that Looney and Scott maintained confidential personnel files on them. On September 27, Fine and Joe McCloy, the head of Ryan's pilot committee, asked Scott if they could review Fine's file. Scott initially refused, saying the file was confidential. Scott then wrote to Fine that she could view the files as long as she personally came to Indianapolis and submitted supporting documentation stating the reasons why she needed access. McCloy had previously been permitted to review his file without any such rigmarole.

Under Ryan's policy, a demoted first officer was eligible for an upgrade six months "later," which Fine interpreted to mean six months from the date of her April 25 demotion. Looney, however, decided that since Fine had taken a 90-day leave of absence she would not be eligible to upgrade until six months after her actual return to work. Fine appealed to Ron Ryan, who overruled Looney and determined that Fine could upgrade through training any time after October 25. Training is normally scheduled one month in advance, but as of October 1, Fine had heard nothing from Ryan about her upgrade. That day she called Looney and pressed him to set a training date and provide her with written confirmation. At this request, Looney became irate, telling Fine he would schedule her at his convenience. He refused to provide a specific date, stating, "Lisa, I don't know. It may be tomorrow, it may be next week, it may be a month, it may be six months. I don't know." Looney then hung up on Fine.

On October 2, Fine wrote a letter to McGoldrick reciting the details of her conversation with Looney. She referenced the September 18 meeting at which she had been called a weak pilot and a whiner. She also complained that Looney had denied her access to her personnel files (although it was actually Scott who had done this). She then stated:

> To date, Danny Looney and Dan Scott have (1) denied me training, (2) delayed scheduling my training, (3) demoted me, (4) hindered my upgrading, (5) pressured me to quit, (6) threatened license revocation, (7) defamed my professional flying reputation. This has caused me humiliation, embarrassment and a loss of income.

> I am a competent professional pilot and believe that the above actions are motivated by the fact that I am female. Other female Ryan pilots have been subjected to similar treatment.

Shortly before sending the letter, Fine was informed orally (but not in writing) that she had been scheduled for upgrade training on October 28.

McGoldrick received Fine's letter on October 9. According to Ryan's sexual harassment policy, employees are to bring all complaints about discrimination by supervisors to the Human Resources Department for investigation. The day she received the letter, McGoldrick turned it over to Looney, who immediately directed her to fire Fine. Before proceeding with that directive, McGoldrick checked with Ron Ryan, who concurred, stating, "If I were her boss, I would fire her ass." McGoldrick then prepared a letter stating that, "Subsequent to receiving your letter . . . it was determined to terminate your employment." Looney noted in Fine's personnel file that he was terminating her because she "routinely missed work and was always hard to get along with." Prior to her dismissal, there were no written complaints about either Fine's attendance or her interpersonal skills in her file.

Fine then filed this Title VII suit charging sexual harassment, sex discrimination, and retaliation. The district court granted Ryan summary judgment on the first two claims. It found that any instances of sexual harassment were time-barred. It also concluded that Ryan had a valid non-pretextual reason for demoting Fine, namely her two failed proficiency checks, and that Fine had no evidence other than speculation and hearsay that the check was manipulated. However, the district court allowed the retaliation claim to proceed to trial. After hearing eight days of testimony, the jury returned a verdict in favor of Fine and awarded $6,000 in compensatory damages and $3.5 million in punitive damages, an award the district court reduced to the statutory cap of $300,000. The court also awarded backpay and attorneys' fees, although it denied Fine's request for reinstatement to her job with Ryan.

**II**

Ryan raises three issues with respect to the jury's finding on liability: (1) it should have been granted judgment as a matter of law because Fine did not have a reasonable belief that she was opposing discrimination; (2) the jury instructions were erroneous; and (3) the district court admitted irrelevant testimony regarding other acts of discrimination by Ryan. We consider each of these points in turn.

**A.**

Title VII makes it unlawful for any employer to discriminate against an employee for opposing a practice made unlawful by the Act. 42 U.S.C. § 2000e-3(a). To prove a case of retaliation, a plaintiff must show: (1) she engaged in statutorily protected expression; (2) she suffered an adverse action at the hands of her employer; and (3) there was a causal link between the two. *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1457 (7th Cir. 1994). Ryan concedes that there was sufficient evidence to meet the second and third parts of this test; we therefore take as a given that Ryan fired Fine for writing the October 2 letter. Ryan nevertheless claims that it should have been granted judgment as a matter of law because Fine did not present enough evidence for a rational jury to conclude that she had a reasonable and good faith belief that her letter was an act of statutorily protected expression. We review the denial of judgment as a matter of law *de novo*, asking whether the evidence, when viewed in the light most favorable to Fine (as the nonmoving party), sufficiently supports the jury's verdict. *Tincher v. Wal-Mart Stores, Inc.*, 118 F.3d 1125, 1129 (7th Cir. 1997).

We have repeatedly held that a plaintiff need not prevail on her Title VII discrimination claim or have opposed an action that in fact violated Title VII to win a retaliation

claim. *McDonnell v. Cisneros*, 84 F.3d 256, 259 (7th Cir. 1996); *Alexander v. Gerhardt Enters., Inc.*, 40 F.3d 187, 195-96 (7th Cir. 1994); *Dey*, 28 F.3d at 1457-58. All that is required is that "she reasonably believed in good faith that the practice she opposed violated Title VII." *Alexander*, 40 F.3d at 195. Yet the heart of Ryan's attack lies in the fact that Fine's discrimination claim failed to survive summary judgment. How, it argues, could Fine reasonably have believed she was complaining about discrimination when the district court found that she was not discriminated against as a matter of law?

Asking the question in this fashion reveals the crux of Ryan's mistake. It is improper to retaliate against anyone for claiming a violation of Title VII unless that claim is "completely groundless." *McDonnell*, 84 F.3d at 259. But a groundless claim is one resting on facts that no reasonable person possibly could have construed as a case of discrimination. Many claims might appear legitimate on the surface, but after discovery and a harder look at the full picture they turn out ultimately to lack merit. Under Title VII, a person may not be terminated for making such a grounded, yet unsuccessful, complaint.

On this record, it is impossible to conclude as a matter of law that Fine had no grounds for believing that Ryan's actions violated Title VII. Fine knew that Looney had initially found her ineligible for training on October 25 and had been overruled by Ron Ryan and that she was now experiencing a delay in scheduling training that none of her male counterparts experienced. She was aware that Ramos and Schindelar had also failed proficiency checks, and that they too believed that the checks had been manipulated to demote female pilots. (In everyday life, it is quite reasonable for people to rely on what they learn from their co-workers; the Federal Rules of Evidence do not govern the workplace.) She and other women had been thwarted in

their attempts to persuade management to respond to complaints of sexual harassment at the September 18 meeting, where Looney had called Fine a "whiner" and discouraged the women from pursuing written complaints. Fine also knew that she had been treated differently from male pilot McCloy when both attempted to see their personnel files. In light of this evidence, a jury could easily find that Fine's belief that she was opposing discrimination was reasonable.

Ryan, citing *Little v. United Technologies*, 103 F.3d 956 (11th Cir. 1997), insists that Fine must present legally admissible objective evidence that she suffered unlawful discrimination to prevail. That is not, however, what the Eleventh Circuit held, nor is it a correct statement of the law. The *Little* court said only that the employee's belief that he was opposing a violation of Title VII had to be a good faith, objectively reasonable belief: "the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable." *Id.* at 960; see also *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1187 (11th Cir. 2001). The standard Ryan proposes would require every retaliation trial to include a mini-trial on the underlying discrimination, a standard that Ryan admits our circuit rejects.

Ryan also seems to believe that Fine cannot now argue that any of the events she complained about in her October 2 letter were discriminatory because she stated in her deposition that there were no incidents that she considered sexually harassing from April 25, 1996, until the date of her termination. But why not? A party is free to contradict her deposition testimony at trial, although her opponent may then introduce the prior statement as impeachment. *Tidemann v. Nadler Golf Car Sales, Inc.*, 224 F.3d 719, 724 (7th Cir. 2000). The jury could have reasonably believed that Fine's earlier statement was an error or that her statement

referred only to workplace harassment and not to disparate treatment in regard to training and personnel files. There was enough evidence for the jury to find that Fine had a good-faith, objectively reasonable belief that Ryan was discriminating against her on the basis of her sex, and we will not disturb its finding.

**B**.

Ryan next complains about the district court's jury instruction on reasonable belief, which stated, "Ms. Fine must also prove that she reasonably believed in good faith that the conduct she complained about violated Title VII. However, her activity may be protected regardless of whether the charges were correct or not." We review jury instructions only for an abuse of discretion and will not reverse unless the instruction inadequately states the law and was likely to have misled the jurors. *Susan Wakeen Doll Co. v. Ashton Drake Galleries*, 272 F.3d 441, 452 (7th Cir. 2001). In this case, the instruction contained no errors of law. See *Alexander*, 40 F.3d at 195-96; *Dey*, 28 F.3d at 1458. While Ryan complains that the term "reasonably believed in good faith" was likely to confuse the jurors, we disagree. Ryan's proposed clarification that Fine's belief must have been "objectively reasonable in light of the facts and record presented" is certainly no better. The district court made no error in approving the instruction.

**C**.

Ryan also objects to the district court's decision to admit the testimony of two of Fine's co-workers, Eugenia Smith and Vicki Ramos. At trial, Ryan filed a motion *in limine* seeking to bar Smith and Ramos from testifying to any incidents of sex discrimination that they had discussed with

Fine, including those at the September meetings, other than those incidents specifically mentioned in the October 2 letter that involved Fine and either Scott or Looney. The court denied this motion. Both women then testified about a number of matters raised at the meetings, including a rumor spread by male pilots that Fine was having an affair, the labeling of female pilots by the shapes of their rear ends, and the fact that all four women had experienced past troubles with the training department.

Ryan argues that all of this testimony was irrelevant to the question of whether Fine was terminated for filing her complaint. This is undoubtedly correct, but that is not the purpose for which the district court admitted the testimony. Instead, the district court found it admissible on the theory that the conversations preceding the writing of the September 6 letter and at the September 18 meeting were relevant to determining whether Fine in fact had a reasonable good-faith belief that she was opposing discrimination through her October 2 letter.

This court has previously found that evidence of underlying sexual harassment is relevant on a retaliation claim to establish that a plaintiff "reasonably believed in good faith that the practice she opposed violated Title VII." *Dunning v. Simmons Airlines, Inc.*, 62 F.3d 863, 874 (7th Cir. 1995) (quoting *Alexander*, 40 F.3d at 195). Because other women but not other men had experienced the same problems with training and proficiency checks that Fine had, it was more likely that both she and any other reasonable person would believe that Looney's foot-dragging in scheduling her own training was illegally based on her sex. The fact that management shrugged its shoulders when informed on September 18 of numerous problems female pilots had experienced with their co-workers could also justify that belief. The October 2 letter specifically refers to the September 18 meeting and, while it does not reallege each

accusation from that meeting, the basic topics of that meeting remain relevant under Rule 401.

Even if we were to agree with Ryan that some of the allegations and rumors were not relevant for any purpose, we would reverse only if there was a significant chance that this error affected the trial's outcome. *Collins v. Kibort*, 143 F.3d 331, 339 (7th Cir. 1998). Ryan speculates that the few statements to which it objected during the eight-day trial somehow caused the jury to conclude that Ryan had engaged in wholesale discrimination against its female employees and to punish it accordingly. But the jury received special verdict forms that permitted it to find for Fine only if she proved that she reasonably believed in good faith that Ryan was violating Title VII. The jury was also instructed to base its verdict only on the law as set out by the district court, and we presume that those instructions were followed. We see no significant chance that the testimony of Smith and Ramos caused the jury to depart from its instructions simply to punish Ryan.

### III

Ryan also disputes the hefty punitive damages awarded to Fine. Under Title VII, punitive damages are appropriate if the plaintiff "demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). As the district court correctly noted, the Supreme Court set out the guiding standard for an award of punitive damages in *Kolstad v. American Dental Ass'n*, 527 U.S. 526 (1999). It rejected the requirement of some courts that punitive damages be available only in "extraordinarily egregious" cases, and instead found an award proper so long as the employer discriminates "in the face of

a perceived risk that its action will violate federal law." *Id.* at 533, 536. A plaintiff can meet this standard by showing that the employer was aware of the law and chose to discriminate anyway. *EEOC v. Indiana Bell Tel. Co.*, 256 F.3d 516, 527 (7th Cir. 2001) (*en banc*). The plaintiff can prove such knowledge by showing either that the individual who discriminated was familiar with the antidiscrimination laws or that the principals of the corporation authorized the action. *Kolstad*, 527 U.S. at 536, 543.

There is more than sufficient evidence here to sustain the adjusted award of punitive damages. Ryan had an anti-discrimination policy of which all its managers were aware. That policy required employees to refer complaints of discrimination by supervisors to McGoldrick for investigation. McGoldrick, however, did not play her assigned role. Instead of investigating Fine's accusations, she immediately turned Fine's letter over to Looney. In addition, McGoldrick's letter to Fine openly indicated that she was terminated for writing the October 2 letter, but Looney recorded in her personnel file that she was terminated for poor attendance and interpersonal skills. The jury obviously found the latter explanation to be pretextual, which permitted it to infer that Looney was aware that terminating Fine for her report of sex discrimination violated federal law. And there is no argument here that Looney was acting contrary to company policy or outside the bounds of his authority, as President Ron Ryan himself concurred with Looney's decision to fire Fine.

Ryan also asserts that because it provided Fine with a "fair treatment hearing" before Ron Ryan to appeal her termination it could not have acted with malice. But this was a question for the jury and certainly does not prove Ryan's lack of malice as a matter of law. Indeed, the fact that Ron Ryan had already weighed in on Fine's firing casts grave doubt on the hearing's fairness. At the hearing, Ron

Ryan declared that he could not reinstate Fine because if he accepted her allegations of discrimination he would have to fire all of his top managers. There is no indication that such steps would have been necessary; Ron Ryan could (and should) have simply recognized that, regardless of the truth of Fine's complaints, it was illegal to terminate her solely for making them. And if all of Ryan's top managers really were discriminating against women, then Ron Ryan should have taken whatever steps necessary to fix the problem and ensure compliance with federal law.

Ryan next contends that awarding Fine punitive damages at the statutory maximum of $300,000 was excessive. Since Ryan is not alleging a constitutional violation, we review this decision only for abuse of discretion. *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 433 (2001).

For its argument, Ryan principally relies on *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1355-56 (7th Cir. 1995). In that case, a "smidgin" of sexual harassment by a single mid-level supervisor in a nearly 200-person company was found to be not "so egregious" as to justify the maximum award of punitive damages. *Id.* at 1352-53. But these cases are fact-specific, and we have made it clear that we will not normally disturb an award of damages in a Title VII case at or under the statutory cap, as this decision is "largely within the province of the jury." *EEOC v. Indiana Bell Tel. Co.*, 214 F.3d 813, 822 n.4 (7th Cir. 2000), *vacated on other grounds*, 256 F.3d 516 (7th Cir. 2001) (*en banc*). When a company has a policy of intentionally disregarding the rights of its employees, the statutory maximum for punitive damages can easily be upheld. *Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 638 (7th Cir. 1996).

Ryan's protestations notwithstanding, there was more than enough evidence for the jury to find its conduct suf-

ficiently egregious to justify the maximum legally possible punitive damages award. Indeed, that is what the jury's very high monetary assessment signaled. (It is therefore not necessary for us to consider whether punitive damages awards that must be adjusted because of the statutory cap should simply be lopped off at the maximum, or if they should be reduced to a number less than or equal to the statutory cap based on a proportional assessment of culpability.) This was not a case where there was a "smidgin" of retaliation, such as a temporary suspension or minor loss of pay. Instead, Ryan, having recently informed its female pilots to put complaints of sexual harassment and discrimination in writing, terminated Fine within 24 hours of its receipt of her complaint on these subjects precisely because she had written the letter. Nor can Ryan credibly argue that its actions were the result of a rogue supervisor, since its general counsel and the president of the company both concurred in the decision. To accept Ryan's position here we would essentially have to hold that the statutory maximum for punitive damages could never be awarded in a Title VII complaint where the plaintiff prevailed only on her retaliation claim. We see no evidence that Congress sought to enact such a rule, and we decline to endorse it. The damages award is affirmed.

**IV**

We turn now to Fine's cross-appeal, which raises three distinct issues. First, Fine asserts that the district court erred by denying her reinstatement to her old position at Ryan. Title VII's remedial scheme is designed to make a plaintiff whole, and reinstatement is often used as an equitable remedy when money damages alone will not suffice. *McKnight v. General Motors Corp.*, 908 F.2d 104, 116 (7th Cir. 1990). Fine argues that because she has been unable to secure comparable employment, she has not been

made whole and Ryan is continuing to profit from its past wrongs. We review the district court's decision only for an abuse of discretion. *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 861 (7th Cir. 2001).

The district court denied reinstatement because Fine stipulated that her claim for damages ceased on January 28, 2000. This stipulation was made to prevent Ryan from inquiring into the circumstances surrounding Fine's resignation from employment with another airline around that time. The district court reasoned that if Fine was seeking no damages after that date, awarding her full backpay and compensatory damages to that time sufficed to make her whole, and reinstatement was not warranted. Fine argues that her stipulation was intended to apply only to money damages, not to equitable remedies such as reinstatement. That is not, however, what the stipulation says. It refers to "any damages" without drawing a distinction between legal and equitable relief. Even more importantly, Fine herself created the endpoint for Ryan's responsibility when she took the new job. It makes no sense to make Ryan her employer of last resort for life, if it bears no responsibility for the actions of later employers. Both because of the stipulation and for the latter reason, we agree with the district court's decision to deny reinstatement.

Fine next disputes the district court's decision to reduce her attorneys' fees by ten percent off the lodestar amount. The court did this because some of the claimed hours were spent on the unsuccessful discrimination claim, and it did not wish to reward Fine for her unsuccessful claims. This decision too is reviewed only for abuse of discretion. *Dunning*, 62 F.3d at 872. Where several claims are presented and the plaintiff prevails on less than all, the court must decide how related the claims were to one another. *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983). This is a classic question of degree. Where the plaintiff achieves

only partial or limited success, the court may at its discretion make a percentage reduction. *Bryant v. City of Chicago*, 200 F.3d 1092, 1101-02 (7th Cir. 2000). Here, in an important sense Fine was fully successful, not partially successful: she received all the monetary relief she could have gotten, even if she had won on every theory. Nevertheless, the district court only reduced the award by ten percent, and this action may have reflected its view that counsel wasted time pursuing less promising theories of liability. Because our review is only for abuse of discretion, and we find none in that decision, we will not disturb the district court's judgment on this point. Compare *Merriweather v. Family Dollar Stores of Ind., Inc.*, 103 F.3d 576, 584 (7th Cir. 1996) (affirming 90% of lodestar award where plaintiff lost discrimination claim but prevailed on retaliation count).

Finally, Fine points out that the district court erred in calculating prejudgment interest by computing interest only through June 30, 2000, even though it did not enter final judgment until November 22, 2000. It is the latter date which is relevant for the calculation. *First Nat'l Bank of Chicago v. Standard Bank & Trust*, 172 F.3d 472, 480 (7th Cir. 1999). Ryan concedes the error but argues that prejudgment interest is not appropriate at all because punitive damages make up almost half the award and this court has held in other contexts that prejudgment interest should not be awarded on punitive damages. But Fine seeks interest only on her award of backpay, not on her punitive damages, and so the error should be corrected. In any event, Ryan did not raise this argument until its reply brief and never mentioned it to the district court, and so it is forfeited. *Sears, Roebuck & Co. v. Murray Ohio Mfg. Co.*, 949 F.2d 226, 228 (7th Cir. 1991).

## V

The judgment of the district court is MODIFIED to reflect a prejudgment interest rate of 8.47% on the judgment of backpay, running through the date of judgment, November 22, 2000. In all other respects, the judgment of the district court is AFFIRMED.


A true Copy:

      Teste:


_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*