Faye A. WHEATFALL, Plaintiff,

v.

**BOARD OF REGENTS OF the UNIVERSITY SYSTEM OF GEORGIA, Defendant.**

Civil Action File No. 1:12–cv–922–TCB.

United States District Court,
N.D. Georgia,
Atlanta Division.

Signed March 31, 2014.

**1346**

Brian J. Sutherland, Edward D. Buckley, Buckley & Klein, LLP, Atlanta, GA, for Plaintiff.

Kimberly Blue Lewis, Office of State Attorney General, Atlanta, GA, for Defendant.

### ORDER

TIMOTHY C. BATTEN, SR., District Judge.

This Title VII retaliation case is before the Court on Plaintiff Faye Wheatfall's objections to the magistrate judge's report and recommendation [71]. The magistrate judge recommends granting the motion for summary judgment of Defendant Board of Regents of the University System of Georgia [58].

## I. Facts

### A. Background

Faye Wheatfall was employed by the Georgia Institute of Technology from 2001 until January 5, 2010.[1] In February 2005, her title became "Accountant III," and her "working title" when her employment ended was "foreign national tax specialist." Except for one month in 2009 when she took medical leave, Wheatfall was the only Georgia Tech employee who performed the duties of a foreign national tax specialist. These duties included meeting with nonimmigrant employees to review and collect documentation to ascertain the proper tax treatment of payments to them; advising the payroll department about an employee's eligibility for a tax-treaty benefit; using tax-compliance software to produce tax analyses and forms; and ensuring that data was timely and accurately entered into the human resources management system and specialized software.

From March 2007 through February 2008, Wheatfall's supervisor was Susan McKoin, Georgia Tech's senior director over talent acquisition and global human resources. In April 2008, Wheatfall's immediate supervisor changed when Doug Podoll became the director of global human resources. In that role, Podoll was responsible for ensuring tax compliance for nonresident aliens, including institute employees, student-scholarship recipients and

---

1. Georgia Tech is part of the University System of Georgia. There is no dispute that the Board of Regents of the University System of Georgia, which governs the University System of Georgia, is the proper Defendant in this action. Even so, for purposes of clarity this Order refers to Defendant as Georgia Tech.

third-party payees; additionally, he was responsible for immigration services for foreign-national employees and human-resource services for Georgia Tech's overseas campuses and other projects. All told, Podoll supervised four employees—all of whom were female.

Until June 2009, Podoll's immediate supervisor was McKoin, Wheatfall's previous supervisor. Between June and November, Podoll reported to two interim supervisors, and in November, Marita Sullivan, Georgia Tech's senior director of research and planning, became his immediate supervisor. Each of Podoll's immediate supervisors reported to Barry "Chuck" Donbaugh, Georgia Tech's associate vice-president of human resources.

### B. Wheatfall's Last Evaluation Before Podoll Became Her Supervisor

In April 2008, McKoin provided Wheatfall her year-end performance appraisal for the period of March 2007 through February 2008. Overall she was rated "fully successful." Specifically, she was rated "fully successful" in attendance and punctuality, work habits and productivity, and "highly successful" in customer service. In the areas of communications and teamwork, however, she was rated "making progress."

In the evaluation, McKoin noted several areas in which Wheatfall could improve. Specifically, she needed "to focus on the future in regards to improvement in processes and teaming with other areas across campus for more seamless transaction" and "to focus on efficiencies in process and maintain positive communications across all level [sic] of the organization." McKoin also advised: "In the future, as we provide a different service level to the campus in the area of Global HR, the current skill-set necessary to do the job as well as performance expectations will be different."

### C. Changes Within the Global Human Resources Department

Shortly after Wheatfall's evaluation, Georgia Tech's global human resources department began using a new software program called GLACIER: Nonresident Alien Tax Compliance System. This is an online tax-compliance system for foreign nationals designed to allow Georgia Tech to efficiently and effectively collect information, make tax-residency and income-tax-treaty determinations, manage paperwork, maintain data, and file reporting statements with the Internal Revenue Service. Although Podoll had never used the GLACIER program, he believed that it would considerably reduce the workload of the foreign national tax specialist. The program was installed in May 2008 and became fully operational by the end of June.

In August, senior-management members Donbaugh, Sullivan and McKoin accepted the recommendation of outside consultants to create a Customer Service Center. The reason for the change was to provide a one-stop-shop for human-resource services for new and current Georgia Tech employees. To effectuate this change, several customer-service representatives, including Wheatfall, had to be relocated. Along with Wheatfall, who was relocated from the second to the first floor, three other employees were relocated to the new center. At the same time, four other employees were relocated from the second to the first floor. While all of the customer-service representatives in the center worked one-on-one with the same client base, only Wheatfall was assigned a cubicle, which afforded her some privacy and additional workspace. Wheatfall's workspace remained in the center until her termination.

### D. Podoll's Issues with Wheatfall's Performance; Wheatfall's Complaints About Podoll's Treatment of Her

Not long after Podoll joined Georgia Tech, he noticed an eighteen-month backlog of unprocessed foreign-national-employee-tax files in Wheatfall's cubicle. Wheatfall admits to the backlog but contends that this was the result of inappropriate archiving by a former human-resources assistant rather than incompetence on her part. Whatever the reason for the backlog, it is undisputed that Podoll worked with Wheatfall to get these files up-to-date.

Wheatfall asserts that in June 2008 she complained to McKoin about Podoll's treatment of her. To her, he seemed to have a problem with women. Around the same time, another employee of Podoll, Suzanne Blough, also complained to McKoin about the disrespectful and degrading manner in which Podoll spoke to her. McKoin testified, however, that Wheatfall never complained about sex discrimination—she "just kind of mentioned" that Podoll did not like women—and that she interpreted the complaint to be about Podoll's communication style.

Following the relocation of her workspace in August 2008, Wheatfall complained to Donbaugh, McKoin's supervisor, that Podoll had her relocated because of his bias against her as a woman, which she inferred from his treatment. Of course, the decision to relocate Wheatfall's office was made by senior management, not Podoll, though he agreed with it.

Podoll testified that in September 2008 he began to notice that Wheatfall was making numerous errors in data entry, such as reversing numbers, misspelling names, failing to enter data, and failing to complete tax files. His interpretation of these errors was that Wheatfall lacked a fundamental understanding of her job. Given the volume of errors, he decided to review the tax-record-data entry for each foreign-national employee, approximately forty to eighty files per week. Podoll also testified that around this time he began receiving complaints from coworkers and management in the customer service center about Wheatfall's lack of cooperation and communication. Given these complaints, he was concerned that Wheatfall was not working effectively with others and thus adversely affecting the overall workflow of the customer service center.

Wheatfall disputes making some or all of the errors that Podoll testified he found; instead, she claims that most of the purported errors were made by other employees and that she told Podoll as much. She also contends that her purported "unprofessional communication" consisted of a single dispute between her and a coworker.

As for the relocation of her workspace, Wheatfall considered it "undesirable in a number of ways." For instance, her new location had considerably more traffic and noise; it was difficult to get into and out of; and her access to the copier and fax machine were less convenient, causing her to come in earlier and stay later to finish her work. She outlined these "pressing concerns" in her September 29 memorandum to Podoll and McKoin; additionally, she questioned the business reasons for keeping her workspace in the customer service center, concluding: "This situation has created for me a very difficult, challenging and counter-productive work environment."

A few days later, Podoll and McKoin met with her about the issues raised in the memo. In a memorandum dated October 8, 2008, Podoll explained the business reasons for her relocation, responded to her

issues with the new workspace, and detailed his expectations for her performance going forward. Podoll acknowledged that while she had initially struggled with data entry in the new software, she had been able to eliminate nearly all errors "with close review." But he also highlighted that her performance had "dropped precipitously" in the past two to three weeks and that this decline coincided with her multiple complaints about the work environment. As proof, he noted that between one-quarter and one-third of the tax files that she completed contained errors. Podoll explained that her examples of a disruptive work environment—people speaking too loudly, office staff greeting one another in the mornings and afternoons as they arrive and depart, and a noisy child with its parent—amounted to nothing more than the "sounds of a busy, yet professional, environment."

Podoll then outlined the expectations for Wheatfall to successfully fulfill her role as a foreign national tax specialist. These included staying in her assigned workspace so that both clients and her coworkers would be able to find her (noting that this had been a problem recently because she had been leaving the center to work upstairs or leaving work entirely); meeting with clients in her assigned cubicle rather than the employee break room or the conference room in the benefits area of the human-resources office; making herself available for questions; and bringing any issues with her coworkers to his attention so that he could ensure that the services provided by the office's various departments were coordinated. After receiving this memo, she began to worry about her job security.[2]

According to Wheatfall, from September 2008 until April 2009 Podoll "routinely treated [her] in a disparaging manner, saying something disrespectful, condescending, demeaning, or downright nasty to her on a weekly basis." Specifically, she alleges that he (1) said that she did not know what she was doing in front of her coworkers and a customer; (2) acted like she was not there when speaking to customers; (3) frequently snatched documents out her hands; (4) made a joke about the wigs she wore; (5) treated other women in a disrespectful and demeaning manner; and (6) treated two male employees differently.

During that period, Wheatfall complained about Podoll's treatment to several individuals. For purposes of this Order, however, only two complaints are relevant: those that she contends constituted protected activity under the anti-retaliation provision of Title VII.

The first is her January 2009 email to McKoin. In that email Wheatfall references her prior discussions with McKoin about Podoll's treatment and states that "the continued humiliation, embarrassment, degradation and unprofessionalism" that Podoll had displayed toward her was unacceptable. The second is her conversation with Podoll in February 2009. She told him that she felt that he had a problem with women, and that if that were the case, she was powerless to change her sex. Podoll responded, "I'm sorry you feel that way."

### E. Wheatfall's 2009 Performance Evaluation and Performance Improvement Plan

Even after the October 8 memo, Podoll remained concerned about Wheatfall's declining job performance and ineffective

---

**2.** She asserts that Podoll began to audit her work after issuing this memo. That assertion, however, is belied by Podoll's testimony and the fact that Podoll references her recent error rate in the October 8 memo.

communication with her coworkers and management. But he did not take any disciplinary action against her. In April 2009, he issued her year-end performance evaluation. Wheatfall's overall rating was "making progress." Podoll explained that she needed to work on better understanding the fundamentals of her job and the timeliness and quality of her communications with others. Specifically, he wrote:

> [Wheatfall] needs to focus on confirming a command of the fundamentals of her tax compliance role. Only when the command is there can she begin to build and strengthen ties to partners [in other Georgia Tech offices]. Related to getting the fundamentals right is getting the details right. Accurate digital and audit paper files is critical to the success of tax compliance on campus. Effective coordination of Global's tax compliance work with the Customer Service area, Payroll, and other offices across campus will require concise, timely, and quality communications.

Dissatisfied with Podoll's evaluation, Wheatfall complained to Donbaugh, McKoin's supervisor. At his suggestion, she prepared a rebuttal performance evaluation, which she presented on May 1. She would have given herself an overall rating of "fully successful." That same day, she attended a meeting with Podoll and McKoin that Donbaugh had set up to discuss her rebuttal performance evaluation. At the end of that meeting, Podoll placed Wheatfall on a performance improvement plan (PIP).

A PIP has only one purpose: to afford an employee every opportunity to address and improve his or her job performance and thus meet the expectations of that position. To that end, the supervisor spe-cifically outlines the position's performance standards and expectations, the employee's performance discrepancies, and the steps that the employee should take to improve. It is not, however, part of Georgia Tech's disciplinary process.

Wheatfall's performance discrepancies, as outlined in her PIP, included frequently entering data incorrectly in GLACIER and other software; failing to update data in GLACIER and other software; color-coding files incorrectly; failing to alphabetize materials; combining multiple employees in one file; communicating in a disrespectful and unprofessional manner with her coworkers and senior management; and failing to perform her fundamental duties effectively and efficiently.[3] Her PIP then set out several corrective steps for her to take.

Wheatfall's PIP review period was to run from May 6 to August 6, 2009. But on August 7, Podoll extended her PIP another sixty days. In doing so, he provided some feedback on her progress and identified areas where additional improvement was needed. Three days later, Wheatfall sent him a memorandum stating that she believed that her PIP did not clearly articulate the requisite performance goals and that she did not believe that the items outlined in the extended PIP were consistent with her initial PIP. On August 14, four days after this memorandum to Podoll, Wheatfall took leave under the Family Leave and Medical Act. She returned to work on September 8, the day after Labor Day.

On September 16, Podoll wrote a memorandum to senior management outlining Wheatfall's continued poor job performance and the detrimental effect that it had

---

3. Although it is undisputed that these discrepancies are set forth in the PIP, Wheatfall disputes that she actually made such errors, and at least for the data-entry errors, she contends that she often corrected errors made by Podoll as well as other employees.

had on his department's ability to meet federal-compliance standards. He recommended terminating her employment. Five days later, Podoll met with senior management to discuss this recommendation. In that meeting, it was agreed to continue their discussions at a later date.

### · F. Wheatfall's Charges of Discrimination and Termination

On September 24, three days after Podoll met with senior management, Wheatfall filed a charge with the Equal Employment Opportunity Commission. She alleged that she had been discriminated against on the basis of sex and that she had been subjected to retaliation for complaining about sex discrimination.

In late December 2009 or early January 2010, Wheatfall and Georgia Tech participated in mediation at the EEOC. Wheatfall, however, rejected Georgia Tech's proposed settlement offer, and the parties were unable to reach an otherwise acceptable agreement. On January 5, "a few days" after the failed mediation attempt, Wheatfall was terminated. In April, Georgia Tech filled the foreign-national-tax-specialist position with a newly hired female.

As a Georgia Tech employee, Wheatfall could appeal her dismissal to Sullivan, Podoll's immediate supervisor. She did, but her appeal was denied. Wheatfall then appealed to the impartial review board. In doing so she had the opportunity to present evidence and witnesses in support of her appeal. The board upheld her termination. Finally, Wheatfall appealed to the president of Georgia Tech, who also upheld her termination.[4]

### G. Procedural History

A week after her termination, Wheatfall filed a second charge of discrimination with the EEOC. In this charge, she claimed that she was fired on the basis of her race, sex and age as well as in retaliation for reporting sex discrimination.

After receiving her right-to-sue notice from the EEOC, she filed this action alleging retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended. Her amended complaint alleges that she complied with all conditions precedent to filing this action. Georgia Tech does not dispute that, nor does it dispute that Wheatfall exhausted her administrative remedies before filing this suit.

Following discovery, Georgia Tech moved for summary judgment. After a careful and thoughtful review, the magistrate judge recommended granting summary judgment. Before the Court are Wheatfall's timely objections to the R & R.

### II. Standard of Review

After conducting a "careful and complete" review of a magistrate judge's findings and recommendations, a district judge may accept, reject or modify a magistrate judge's R & R. *Williams v. Wainwright*, 681 F.2d 732, 732 (11th Cir.1982) (quoting *Nettles v. Wainwright*, 677 F.2d 404, 408 (5th Cir.1982) (en banc)) (internal quotation mark omitted).[5] A district judge

---

4. Additional facts that are not needed to resolve Wheatfall's objections to the R & R are set forth in the magistrate judge's thorough, seventy-five-page R & R.

5. The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981)

(en banc). Additionally, all decisions issued after that date "by a non-unit panel of the Former Fifth, the full en banc court of the Former Fifth, or Unit B panel of the Former Fifth Circuit" are binding precedent absent a contrary en banc Eleventh Circuit decision. *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir.1982); *see also United States v. Schultz*, 565 F.3d 1353, 1361 n. 4 (11th Cir.

"shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). The district judge must "give fresh consideration to those issues to which specific objection has been made by a party." *Jeffrey S. v. State Bd. of Educ. of Ga.*, 896 F.2d 507, 512 (11th Cir.1990). Those portions of an R & R to which an objection is not asserted may be reviewed for clear error. *United States v. Slay*, 714 F.2d 1093, 1095 (11th Cir.1983).

Here, Wheatfall objects to the following findings and conclusions of the magistrate judge:

(1) that she failed to present sufficient evidence that any of her complaints were objectively reasonable;

(2) that the negative performance review, being placed on a PIP, and having that PIP extended were not materially adverse actions;

(3) that she failed to establish protected activity predating Podoll's allegations of deficient job performance;

(4) that the evidence submitted through the declaration of Bruce McMillian should be excluded as immaterial;

(5) that she failed to establish that Georgia Tech's purported legitimate, nondiscriminatory reason for her termination was merely pretext for unlawful retaliation; and

(6) that she failed to establish a triable issue as to her termination within days of her participation in protected activity under Title VII.

## III. Legal Standard

Summary judgment is proper when no genuine issue about any material fact is present, and the moving party is entitled to judgment as a matter of law. FED. R.CIV.P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The movant carries the initial burden and must show that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

The nonmovant is then required to "go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. "The mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. And "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

## IV. Discussion

An employer cannot retaliate against an employee "because she has opposed any practice made an unlawful employment practice by Title VII, or because she has made a charge, testified, assisted, or participated in any manner in an investiga-

2009) (discussing the continuing validity of *Nettles*).

tion, proceeding, or hearing thereunder." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir.2008) (internal brackets omitted) (quoting 42 U.S.C. § 2000e–3(a)) (internal quotation marks omitted). Courts generally refer to these prohibitions as the opposition clause and the participation clause. *EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir.2000).

■ Because Wheatfall's retaliation claim is based on circumstantial evidence, the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and refined by later cases governs the analysis. Under that framework, the burden of production shifts back and forth, but the burden of proof always remains with Wheatfall. *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008).

■ Wheatfall's first step under that framework is to establish a prima facie case of retaliation. This requires evidence of (1) statutorily protected activity; (2) a materially adverse action; and (3) a causal connection between the protected activity and the adverse action. *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1211 (11th Cir. 2013). Establishing a prima facie case creates a rebuttable presumption that the driving force behind the materially adverse action was an intent to retaliate. To rebut this presumption, Georgia Tech may then offer a legitimate, nondiscriminatory reason for the materially adverse action. If it does, then Wheatfall must come forward with proof that the proffered reason is merely pretext. *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181–82 (11th Cir. 2010). Summary judgment is thus inappropriate where the evidence, viewed in the light most favorable to the employee, creates a reasonable inference that the materially adverse action was the result of an intent to retaliate. *See Smith v. Lock-*

*heed–Martin Corp.*, 644 F.3d 1321, 1326 (11th Cir.2011).

## A. Protected Activity Under the Opposition Clause

The anti-retaliation provision applies only if Wheatfall engaged in protected activity within the meaning of the participation or opposition clause. Wheatfall contends that she engaged in protected activity under the opposition clause on four occasions: June 2008, August 2008, January 2009 and February 2009. Each time, she allegedly opposed either sex discrimination or a sexually hostile work environment.

■ To be sure, reporting sex discrimination or a sexually hostile work environment constitutes protected activity. *See* 42 U.S.C. § 2000e–5; *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). This is no less true because Wheatfall's complaints were informal. *Rollins v. State of Fla. Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir.1989). But regardless of whether her complaints were formal or informal, they are not protected activity unless they satisfy two requirements.

■ First, her complaint must have put Georgia Tech on notice that she was opposing a practice made unlawful by Title VII. *See Murphy v. City of Aventura*, 383 Fed.Appx. 915, 918 (11th Cir.2010) ("A complaint about an employment practice constitutes protected opposition only if the individual explicitly or implicitly communicates a belief that the practice constitutes unlawful employment discrimination." (quoting EEOC Compl. Man. (CCH) §§ 8–II–B(2) (2006)) (internal quotation marks omitted)).

■ Second, the complaint must have been based on "a 'good faith reasonable

belief" that her employer was engaged in unlawful discrimination." *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir.1999). This means that Wheatfall must show that she "subjectively believed that [Georgia Tech] engaged in unlawful discrimination and that 'h[er] belief was *objectively* reasonable in light of the facts and record present.'" *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010) (quoting *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir.1997)). And while the opposed conduct need not be unlawful discrimination, it "must be close enough to support an objectively reasonable belief that it is." *Clover*, 176 F.3d at 1351. To determine whether the opposed conduct is "close enough" to an unlawful employment practice, it is "measured against existing substantive law" at that time. *Id.*

While the record is far from clear that her complaints explicitly or implicitly notified Georgia Tech that she was opposing an unlawful employment practice, the Court nonetheless assumes without deciding that they did. The Court also assumes without deciding that Wheatfall subjectively believed that she was the victim of sex discrimination and that her work environment was sexually hostile. The question then is whether Wheatfall's beliefs were objectively reasonable. The magistrate judge concluded that they were not. Wheatfall objects to this conclusion. De novo review thus begins with a question: when is opposed conduct close enough to discrimination to constitute protected activity under the anti-retaliation provision?

■■■ This Court recently answered that question. *See Taylor v. Cardiovascular Specialists, P.C.*, 4 F.Supp.3d 1374, No. 1:11–cv–4521–TCB, 2014 WL 1004118 (N.D.Ga. Mar. 17, 2014). As *Taylor* explains, the Eleventh Circuit's case law makes clear that the anti-retaliation provision does not protect plaintiffs who oppose conduct that cannot reasonably constitute discrimination—for example, when circuit precedent holds that such is not unlawful or where the conduct is not "anywhere near" sufficiently offensive.[6] *Id.* at 1379, 2014 WL 1004118 at *4.

> Put simply, subjectively offensive conduct falls along a spectrum. At one end is conduct that is nowhere near sufficient, so no reasonable person could believe it is discrimination. At the other end is conduct that as a matter of law is discrimination, so every reasonable person would believe it is discrimination. Between these poles is conduct that a reasonable person could, but is not required to, believe is discrimination.

*Id. Taylor* concludes that opposed conduct is "close enough" to warrant a reasonable belief that it constitutes unlawful discrimination "so long as it *could* (even if it likely would not) persuade a reasonable jury." *Id.* (footnote omitted).

Applying this rule here, Wheatfall's complaints thus qualify as protected activity under the anti-retaliation provision only if she opposed conduct that, "when viewed cumulatively and in its social context, comes anywhere near constituting sexual harassment" or sex discrimination. *Id.* at 1380, 2014 WL 1004118 at *5 (citing *Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 752

---

6. *See, e.g., Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir.2008) ("Where binding precedent squarely holds that particular conduct is not an unlawful employment practice by the employer, and no decision of this Court or of the Supreme Court has called that precedent into question or undermined its reasoning, an employee's contrary belief that the practice is unlawful is unreasonable."); *Clover*, 176 F.3d at 1351–52 (holding that the plaintiff did not have an objectively reasonable belief when the conduct she opposed "misse[d] the mark by a country mile").

(7th Cir.2002) ("It is improper to retaliate against anyone for claiming a violation of Title VII unless that claim is 'completely groundless.' But a groundless claim is one resting on facts that no reasonable person possibly could have construed as a case of discrimination." (internal citation omitted))).

### 1. June 2008

In her brief in opposition to summary judgment, Wheatfall does not claim that she engaged in protected activity in June 2008. On the contrary, she contends that she "first engaged in protected activity when she complained to Donbaugh that she believed that Podoll relocated her workspace with a discriminatory intent" in August 2008. So the magistrate judge never considered whether she engaged in protected activity in June 2008. For that reason, no further consideration is required. *See Williams v. McNeil,* 557 F.3d 1287, 1292 (11th Cir.2009) (noting that district courts have broad discretion to decline to consider arguments not raised before the magistrate judge).

### 2. August 2008

Wheatfall contends that "she reasonably believed that the relocation was a discriminatory adverse employment action." After all, she reported that it "created for [her] a very difficult, challenging and counter-productive work environment." She objects to the magistrate judge's conclusion that,

based on the evidence of record, her belief was not objectively reasonable. Her argument focuses on whether the relocation could constitute an adverse employment action. In her view, the magistrate judge erred by giving "short-shrift to [her] assertion that she reasonably believed [that] the relocation was a discriminatory adverse employment action." In the end, she posits that summary judgment on whether her August 2008 complaint was protected activity is inappropriate because a genuine dispute exists over whether her relocation was an adverse employment action.

Because her claim is for retaliation, not sex discrimination, she does not have to prove that the conduct that she opposed was actually sex discrimination.[7] *See Clover,* 176 F.3d at 1351. But she does have to show that a reasonable person, viewing the facts cumulatively and in their social context, could find that Podoll's conduct was close enough to sex discrimination. Hence, the salient question, as the magistrate judge recognized, is whether she can "point to some evidence in the record indicating that, at the time she made the alleged complaints, Podoll had taken some action against her that a reasonable person would have considered to be unlawful discrimination or harassment on the basis of sex" under Eleventh Circuit law at that time. [71] at 48.

---

7. The R & R states:
 [Wheatfall] argues that she "believed [her relocation] was based on her gender as a result of Podoll's treatment and comments, and it caused her inconvenience and disruption that was significant enough to require her to work longer [h]ours and disrupt her ability to do her job." This falls short of *demonstrating unlawful discrimination* or a hostile work environment on the basis of sex.
 ▮ at 55 (emphasis added).
 Wheatfall seizes upon the emphasized language to argue that the magistrate judge ana-

 lyzed her August 2008 complaint under the wrong standard. That argument, however, finds no support in a fair reading of the R & R. Indeed, the magistrate judge correctly identified the applicable standard: "To recover under a theory of retaliation, a plaintiff need not *prove* the underlying claim of discrimination that led to the complaint, so long as she had a 'good faith, reasonable belief' that the conduct or practice she was opposing constituted unlawful discrimination." [71] at 47 (quoting *Clover,* 176 F.3d at 1351).

■ Although setting forth a prima facie case of sex discrimination is not onerous, it does require that the plaintiff establish "facts adequate to permit an inference of discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997). For this reason, unless the plaintiff suffered a change in employment status (e.g., termination or demotion), a prima facie case usually includes evidence that a similarly situated comparator was treated more favorably than the plaintiff.[8] Consequently, to prevail the plaintiff often establishes "(1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated male employees more favorably; and (4) she was qualified to do the job." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir.1999).

■ In some cases a similarly situated comparator does not exist. But this does not necessarily doom the plaintiff's claim. "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate *where no other evidence of discrimination is present.*" *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1092 (11th Cir.2004) (quoting *Holifield*, 115 F.3d at 1562) (internal quotation marks omitted). Evidence of discrimination exists when a reasonable jury could conclude that the employer's adverse employment action was motivated by discriminatory intent. This is because "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

■ Wheatfall lacks such evidence. These are the only facts that she marshals: she complained in June to Podoll's supervisor, Susan McKoin, that he was treating her poorly because she was a woman. Around the same time one of her coworkers made a similar complaint.[9] When her workspace was relocated in August, she initially believed that this was Podoll's decision. The relocation was hard on her because the area was noisy, and the copier, fax machine, and other office supplies were no longer conveniently available, causing her to work longer to complete her work. So she complained to Donbaugh that Podoll had relocated her workspace because of his bias against her as a woman, which she inferred from his treatment.

But these are not the only facts of record. At the time of her relocation, three other employees were also moved to the new customer service center, and four other employees were moved from the second floor to the first. And in the center, the only employee who had a cubicle—which offered some privacy and additional workspace—was Wheatfall.

Because all of the employees who reported to Podoll during this period were women, Wheatfall cannot establish that he treated similarly situated comparators dif-

---

8. In cases involving a change in employment status, it is possible for the plaintiff to establish a prima facie case by showing that she was replaced by someone outside of the protected class. *See, e.g., Hinson v. Clinch Cnty., Ga. Bd. of Educ.*, 231 F.3d 821, 828 (11th Cir.2000) ("To establish a prima facie case, [the plaintiff] has to show four things: (1) that she was a member of a protected class, (2) that she was qualified for the job, (3) that she suffered an adverse employment action, and (4) that she was replaced by someone outside the protected class."). This rule is inapplicable here because Wheatfall was replaced by a woman.

9. McKoin testified that she understood these complaints to be about Podoll's communication style, not sex discrimination.

ferently.[10] And even if the challenges of her workspace relocation were sufficient to constitute an adverse employment action— a "serious and material change in the terms, conditions, or privileges of employment," *Crawford,* 529 F.3d at 971—the evidence that Wheatfall offers comes nowhere close to allowing a reasonable person to infer that her relocation constituted sex discrimination. First, her self-serving assessment of Podoll's treatment cannot establish that she was relocated because of her sex. *See Wilson,* 376 F.3d at 1092 ("[The plaintiff's] self-serving assertion that she was not insubordinate does not alone establish that she was terminated because of her sex."). Second, the only other evidence that she proffers is that one of her coworkers also complained about Podoll's treatment around the same time. Wheatfall offers almost no evidence for a reasonable person to evaluate. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505 (holding that a "mere scintilla" of evidence that supports the nonmoving party's case will not preclude summary judgment for the moving party).

Contrary to her suggestion, the question is not whether Podoll's actions would have been discriminatory if her belief was true (i.e., that he relocated her workspace because of his bias against women).[11] Rather, the question is whether a reasonable person could look at the *objective* evidence that she has presented and conclude that his conduct was "close enough" to sex discrimination to imbue her opposition with protection under the anti-retaliation provi-sion. Thus, absent concrete examples of his allegedly sex-based conduct, it is impossible to find that his conduct comes anywhere near sex discrimination. Accordingly, Wheatfall's August 2008 complaint does not qualify as protected activity.

### 3. January and February 2009

Wheatfall contends that an email she sent to McKoin in January 2009 and her conversation with Podoll in February 2009 qualify for protection under the opposition clause. Again, these acts constitute protected activity only if the conduct that she complained about was close enough to a sexually hostile work environment. It was not.

▆▆▆▆ Under the well-established standard for hostile-work-environment claims, the plaintiff must show that (1) she is a member of a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her sex (or other protected characteristic); (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment; and (5) a basis exists for holding the employer liable either directly or vicariously. *Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir. 2002). Put plainly, a hostile work environment exists when "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v.*

---

10. In her brief in opposition to summary judgment, she contends that Podoll treated two men differently from the way he treated women. But as the magistrate judge noted, she does not provide any specific examples of how Podoll allegedly treated these men differently. Nor does she offer any other evidence that would indicate that they were otherwise similarly situated.

11. This test would reduce the inquiry to a single question: could Wheatfall reasonably believe that the relocation of her workspace was an adverse employment action? This is not, however, the applicable test under the law of this circuit.

*Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

 Title VII does not impose a federally mandated code of conduct. *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1245 (11th Cir.1999) (en banc). The Supreme Court has made clear that "not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). For example, " 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.' " *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (internal citation omitted).

 Evidence of offensive conduct is weighed cumulatively and in context. *Mendoza,* 195 F.3d at 1245. An environment is hostile when it is perceived to be such by the plaintiff and a reasonable person in the plaintiff's shoes would agree. *Id.* at 1246. This perception may be based on the conduct's severity or pervasiveness. *Id.* Thus, courts measuring allegedly discriminatory conduct consider its "frequency . . .; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). In the end, the question is whether "members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (quoting *Harris,* 510 U.S. at 25,

114 S.Ct. 367 (Ginsburg, J., concurring)) (internal quotation mark omitted).

Here, the magistrate judge concluded that the evidence of record does not come close to establishing that Wheatfall's work environment was sexually hostile. Wheatfall objects. She highlights her own observation that she—but not the men in the office—was the target of Podoll's condescending and demeaning comments on a weekly basis. For instance, she says that he "routinely treated me in a disparaging manner, saying something disrespectful, condescending, demeaning, or downright nasty to me on a weekly basis" from September 2008 through April 2009. As for specifics, she offers only that he (1) said that she did not know what she was doing in front of her coworkers and a customer; (2) acted like she was not there when speaking to customers; (3) frequently snatched documents out her hands; (4) made a joke about the wigs she wore; (5) treated other women in a disrespectful and demeaning manner; and (6) treated two male employees differently. In her view, these facts establish a prima facie case of hostile work environment, so they are more than enough to show that her belief was objectively reasonable.

Wheatfall is wrong. As the magistrate judge underscores, she proffers no specific evidence that Podoll discriminated against her on the basis of sex. Even if Podoll's open criticism of her performance, dismissive treatment, and penchant for gruffly removing documents from her hands constitute "harassment" in the colloquial sense, these acts alone are not actionable under Title VII. After all, Title VII does not allow employees to seek relief for inappropriate, unadvisable, discourteous, or boorish conduct. *See Mendoza,* 195 F.3d at 1245. Indeed, "Title VII does not prohibit profanity alone, however profane. It does not prohibit harassment alone, how-

ever severe and pervasive. Instead, Title VII prohibits discrimination, including harassment that discriminates based on a protected category such as sex." *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1301–02 (11th Cir.2007).

Here, Wheatfall's personal observations that Podoll treated women and men differently support only her subjective belief that her work environment was sexually hostile. Without specifics, however, a hypothetical reasonable person has nothing to evaluate. *See Mendoza*, 195 F.3d at 1246 (holding that a hostile work environment exists when a person in a the plaintiff's position would view the severity or pervasiveness of the conduct as hostile). The only specific allegation is that Podoll once allegedly joked about her wigs. Even if his joke was sex-based, no reasonable person could conclude that Wheatfall's work environment was sexually hostile based on one offensive joke. *See Butler*, 536 F.3d at 1213–14 (holding that coworker's use of a racial epithet twice within a few minutes was "not even close" to creating a racially hostile work environment, thus the employee's belief that it did was not objectively reasonable). Hence, Wheatfall's email to McKoin and conversation with Podoll do not constitute protected activity under the opposition clause.

**B. Materially Adverse Action and Causal Connection**

Because Wheatfall has failed to establish that her complaints constitute protected activity under the opposition clause, the Court need not evaluate whether (1) the negative performance evaluation, (2) the PIP, or (3) the extended PIP—whether individually or collectively—constitute materially adverse actions. Absent protected activity, Wheatfall's prima facie case of retaliation fails as a matter of law. *See Kidd*, 731 F.3d at 1211.

Additionally, because her prima facie case of retaliation fails, Wheatfall has not established that she engaged in any protected activity predating Podoll's charges of deficient job performance. So regardless of whether Podoll knew about her discussions with McKoin or Donbaugh, the "file" that he created of her mistakes, which Wheatfall contends was created to justify her termination, cannot be considered mere pretext for his unlawful intent to retaliate against her—at least within the meaning of the anti-retaliation provision.

**C. Retaliatory Hostile Work Environment**

 In a footnote, Wheatfall contends that the magistrate judge erred by ignoring her claim for a retaliatory hostile work environment under *Gowski v. Peake*, 682 F.3d 1299 (11th Cir.2012). This is incorrect. A prima facie case of retaliatory hostile work environment, like a prima facie case of retaliation generally, requires the establishment of protected activity. *Id.* at 1311. Having failed to do so, her retaliatory-hostile-work-environment claim necessarily fails.

**D. The Affidavit of Bruce McMillian**

After her termination, Wheatfall sought advice and assistance with presenting her complaints to Georgia Tech and the EEOC from Bruce McMillian, a manager of the Alternative Dispute Resolution Program for the Federal Aviation Administration. Along with her brief in opposition to summary judgment, Wheatfall submitted McMillian's affidavit, which introduces the following facts.

To better understand Wheatfall's claims, McMillian made contact with employees at Georgia Tech. In doing so, he spoke with Susan Blough and "another woman whose name [he could not] remember." Both women, according to his declaration, cor-

roborated Wheatfall's allegations and told him that Podoll treated all of the women in the office in a discriminatory manner.

McMillian also spoke with a lawyer who worked for Georgia Tech, Kate Wasch, who denied that Podoll discriminated against Wheatfall because of her race. After clarifying that Wheatfall's complaint was for sex rather than race discrimination, he declares that Wasch replied: Podoll "may not be warm and fuzzy when it comes to women, however, he did not discriminate against Ms. Wheatfall based on her race."

Georgia Tech objected to the consideration of these statements. The magistrate judge concluded that the evidence contained in McMillian's affidavit should be excluded because it is immaterial to the issues presented on summary judgment. Wheatfall objects to the exclusion of this evidence, arguing that "courts accept evidence of discrimination complaints by a plaintiff's coworkers as probative of the objective reasonableness of the plaintiff's belief that she was being subjected to unlawful discrimination." In support of this proposition, however, she cites no binding circuit precedent.

The magistrate judge did not err in excluding the two pieces of evidence introduced through McMillian's affidavit. This is not to suggest that the complaints of coworkers or the admissions of a party's agents are always irrelevant to the objective-reasonableness inquiry. If, for example, the coworkers offered additional facts that would help a reasonable person determine whether the opposed conduct was close enough to unlawful discrimination, such evidence should be admitted. *See Fine*, 305 F.3d at 753–54 (holding that the district court did not err by admitting the testimony of two coworkers who testified about a number of incidents that they discussed with the plaintiff, including their

own experiences). As the Seventh Circuit in *Fine* reasons, "Because other women but not other men had experienced the same problems ..., it was more likely that [the plaintiff] and any other reasonable person would believe" that the opposed conduct was based on her gender. 305 F.3d at 754.

But *Fine*, which is not binding on this Court, is distinguishable. First, unlike Podoll, who only supervised women, the supervisors in *Fine* supervised both men and women, and there was evidence in the record that Fine knew that she was experiencing difficulties that her male coworkers were not. *See id.* at 750 (difficulty accessing personnel file); *id.* at 752 (difficulty scheduling training). Second, unlike Wheatfall, Fine offered specific examples of the conduct that she opposed rather than conclusory statements, thereby permitting the jury to determine whether she could have reasonably believed that this conduct was discriminatory. *Id.* at 753. Finally, Fine's coworkers testified about events that they had discussed with Fine. *Id.* Here, there is no evidence that Blough, "another woman" or Georgia Tech's lawyer ever discussed Podoll's conduct with Wheatfall, nor do these women purport to provide any specifics about Podoll's allegedly discriminatory conduct.

In the end, the objective reasonableness of Wheatfall's beliefs is measured against the law at the time of each complaint. *See Clover*, 176 F.3d at 1351; *Little*, 103 F.3d at 960. In practical terms, this means that the opposed conduct must be capable of persuading a reasonable jury, even if it is unlikely to do so. *Taylor*, 4 F.Supp.3d at 1379, 2014 WL 1004118, at *4. The conclusory statements of Blough and "another woman" that Podoll treated all women in a discriminatory manner, like Wheatfall's allegation that she was the victim of sex discrimination, fails to specify how Podoll

treated women discriminatorily, thereby depriving a reasonable person of the ability to measure his alleged conduct against the law existing at the time of Wheatfall's complaints. Nor is there any evidence of when they made these observations, so it is impossible to tell which of Wheatfall's complaints these facts supposedly bolster. This is just as true for the admission of one of Georgia Tech's lawyers that Podoll was not "warm and fuzzy when it came to women." Under these circumstances, the magistrate judge was right not to consider these statements. Accordingly, the two pieces of evidence introduced through McMillian's affidavit have been excluded as immaterial.

### E. Wheatfall's Participation–Clause Claim

■ Wheatfall has established a prima facie case of retaliation under the participation clause. First, she engaged in protected activity by filing a charge of discrimination with the EEOC in September 2009. *See Pipkins v. City of Temple Terrace, Fla.,* 267 F.3d 1197, 1201 (11th Cir. 2001) (holding that protected activity "includes internal complaints of sexual harassment to supervisors as well as complaints lodged with the EEOC"). And like the magistrate judge, the Court assumes without deciding that her participation in mediation at the EEOC in late December or early January constituted a separate form of protected activity.

Second, she suffered a materially adverse action when she was terminated a few days after the failed mediation. *See White,* 548 U.S. at 68, 126 S.Ct. 2405 (defining *materially adverse action* as conduct that could have "dissuaded a reasonable worker from making or supporting a charge of discrimination" (quoting *Rochon v. Gonzales,* 438 F.3d 1211, 1219 (D.C.Cir. 2006)) (internal quotation marks omitted)).

Lastly, the fact that only a few days passed between her rejection of Georgia Tech's settlement offer and her termination is sufficient to establish a causal connection for purposes of her prima facie case. *See Higdon v. Jackson,* 393 F.3d 1211, 1220 (11th Cir.2004) ("A 'close temporal proximity' between the protected expression and an adverse action is sufficient circumstantial evidence of a causal connection for purposes of a prima facie case.").

■ Georgia Tech, however, rebutted Wheatfall's prima facie case by providing a legitimate, nondiscriminatory reason for firing Wheatfall: her continued poor job performance. And the magistrate judge concluded that Wheatfall had failed to establish that the purported reason was mere pretext. Wheatfall objects to this conclusion, contending that she has established a jury question on the issue of pretext.

#### 1. Establishing Pretext

■ Wheatfall's retaliation claim can survive summary judgment only if she presents "sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of [Georgia Tech's] proffered reasons for its challenged action." *Combs v. Plantation Patterns,* 106 F.3d 1519, 1529 (11th Cir.1997). Her evidence must "demonstrate weaknesses or implausibilities in the proffered legitimate reason so as to permit a rational jury to conclude that the explanation given was not the real reason, or that the reason stated was insufficient to warrant the adverse action," thus allowing a reasonable jury to infer that unlawful discrimination was the real reason. *Rioux v. City of Atlanta, Ga.,* 520 F.3d 1269, 1279 (11th Cir.2008). Given that Wheatfall's burden of rebutting pretext under the *McDonnell Douglas* framework merges with her ultimate burden of proving that retaliation

was the real reason for her termination, *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), she can survive summary judgment "(1) by showing that the legitimate nondiscriminatory reasons should not be believed; or (2) by showing that, in light of all of the evidence, discriminatory reasons more likely motivated the decision than the proffered reasons," *Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1332 (11th Cir. 1998).

To do so, Wheatfall may rely on either new evidence or evidence previously used to establish the prima facie case. *Combs,* 106 F.3d at 1528. But what she may not do is "recast [Georgia Tech's] proffered nondiscriminatory reasons or substitute [her] business judgment for that of [Georgia Tech]." *Chapman v. AI Transport,* 229 F.3d 1012, 1030 (11th Cir.2000). So long as Georgia Tech's "reason is one that might motivate a reasonable employer, [Wheatfall] must meet that reason head on and rebut it, and [she] cannot succeed by simply quarreling with the wisdom of that reason." *Id.* Rebuttal requires "significant probative" evidence of pretext; conclusory allegations alone are insufficient. *See Mayfield v. Patterson Pump Co.,* 101 F.3d 1371, 1376 (11th Cir.1996).

Additionally, the Court will not "second-guess the business judgment of [Georgia Tech]." *See Combs,* 106 F.3d at 1543. Whether its decision to fire Wheatfall was "prudent or fair" is irrelevant. *See Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1361 (11th Cir. 1999). To be clear, Georgia Tech may "fire [Wheatfall] for a good reason, bad reason, a reason based on erroneous facts, or for no reason at all" so long as it is not a retaliatory reason. *Nix v. WLCY Radio/Rahall Commc'ns,* 738 F.2d 1181, 1187 (11th Cir.1984). And since she has attacked the veracity of Georgia Tech's prof-

fered reasons, "[the] inquiry is limited to whether [Georgia Tech] gave an honest explanation of its behavior." *Kragor v. Takeda Pharm. Am., Inc.,* 702 F.3d 1304, 1310–11 (11th Cir.2012) (first alteration in original) (quoting *Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir.1991)) (internal quotation marks omitted).

### 2. Whether Wheatfall Has Established a Jury Question on the Issue of Pretext

Wheatfall suggests that Georgia Tech must present a nonretaliatory reason for firing her just days after she declined to settle her case. That is, because she committed no act that could justify terminating her between her refusal to settle and her termination, "*[t]his* is the pretext, not anything that may have happened before." To support her theory that her rejection of the settlement offer rather than her poor performance motivated her termination, she latches on to the fact that senior management decided not to act immediately on Podoll's recommendation to fire her in September 2009. In her view, they seemingly construed the facts in her favor and "decided, all things considered, they would allow her to continue to be employed."

To be sure, Georgia Tech must present a legitimate, nondiscriminatory reason for firing her. But this reason need not be based on conduct that occurred after her last protected act. As the Eleventh Circuit has explained, "Title VII's anti-retaliation provisions do not allow employees who are already on thin ice to insulate themselves against termination or discipline by preemptively making a discrimination complaint." *Alvarez v. Royal Atl. Developers,* 610 F.3d 1253, 1270 (11th Cir.2010). And where, as here, the record establishes that the employer "had legitimate non-discriminatory reasons to fire [the employee] before she [engaged in

protected activity], ... it remained free to act on those reasons afterward." *Id.* What the employer cannot do, however, is fire her sooner than it would have *because* of her protected activity. *Id.* So just because Wheatfall engaged in protected activity by participating in mediation at the EEOC, this does not immunize her from being fired so long as her termination was warranted. After all, the anti-retaliation provision prohibits employers from taking only those actions that could dissuade a reasonable worker from making or supporting a charge of discrimination. *White,* 548 U.S. at 67–70, 126 S.Ct. 2405.

 Here, Podoll testified that he continued to find Wheatfall's performance lackluster from September 2009 until the end of the year. Indeed, Podoll's dissatisfaction with her performance can be traced to at least October 2008, when he notified her of his expectations for her performance going forward.

Wheatfall counters that she did not make all of the errors that Podoll attributed to her and that Podoll knew that others were making errors. In her view, "Podoll's knowledge that others were actually making the mistakes is proof that his claim that she made mistakes is 'unworthy of credence.'" She also clearly thought more highly of her job performance than Podoll, as evidenced by comparing her rebuttal performance evaluation with her actual evaluation.

 The pretext inquiry, however, "centers on the employer's beliefs, not the employee's beliefs, and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Alvarez,* 610 F.3d at 1266. So what Wheatfall thought of her performance is irrelevant. And given that she did not engage in protected activity until after Podoll recommended her termination, there is nothing inherently suspect about his belief that she was making numerous mistakes. Nor does the fact that Podoll knew that others were making mistakes suggest that his belief that she, too, was making mistakes is unworthy of credence, especially since he testified that Wheatfall was the only person who used the particular field that contained the errors at issue.

Finally, Wheatfall points to no evidence of record that her termination would not have occurred when it did other than the fact that senior management initially decided to delay acting on Podoll's recommendation to fire her. As for why they decided to delay, the record is silent. Wheatfall's unfounded speculation about their reasons for doing so is not a substitute for evidence. Georgia Tech's decision to fire a tax specialist with a documented history of poor performance just after the new year is one that a reasonable employer might make. And the fact that she engaged in protected activity just days before does not *ipso facto* save her retaliation claim from summary judgment.

In sum, Wheatfall's argument amounts to little more than quarreling with the correctness and timing of Georgia Tech's decision to fire her. For that reason, she has failed to rebut Georgia Tech's proffered reasons for her termination. *See Chapman,* 229 F.3d at 1030. Summary judgment will therefore be granted on her retaliation claim.

## V. Conclusion

The R & R [71] is ADOPTED. The Board of Regents' motion for summary judgment [58] is GRANTED. The Clerk is DIRECTED to close this case.

IT IS SO ORDERED.